**JJJ CORPORATION**

v.

**The UNITED STATES.**

**No. 2–74.**

United States Court of Claims.

May 17, 1978.

---

7. Note 6, *supra.*

Jerome S. Hertz, Boston, Mass., for plaintiff; Dianne C. Roberts and Mintz, Levin, Cohn, Glovsky & Popeo, Boston, Mass., of counsel.

James S. Maxwell, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, for defendant; Theodore D. Peyser, Jr., Donald H. Olson and C. Patrick Derdenger, Washington, D. C., of counsel.

Before COWEN, Senior Judge, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This action was brought for the refund of an accumulated earnings tax penalty assessed pursuant to sections 531 *et seq.* of the Internal Revenue Code of 1954. The case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Francis C. Browne. After considering the briefs and exceptions of the parties, and after hearing oral argument, we have concluded that we agree with the trial judge's opinion, which is set forth *infra*, as supplemented and modified by the following.*

The taxpayer's fiscal year ended August 31, 1970. In holding that the plaintiff corporation was "formed or availed of" for the purpose of avoiding the income tax with respect to its shareholders for the fiscal year, the trial judge determined that the taxpayer had not met the burden of proof of showing that it had not accumulated earnings and profits beyond the reasonable needs of its business, as required by section 533(a) of the Internal Revenue Code, and consequently, there is a statutory presumption that such earnings and profits were accumulated for the purpose of avoiding the income tax.

One of the principal attacks made by the taxpayer against the trial judge's decision is that in making such determinations, the trial judge erred as a matter of law by considering the intentions and actions of the corporate directors and officers during the period September 1, 1970 to February 3, 1971, a period after the close of the taxpayer's fiscal year. In making this contention, the taxpayer relies primarily on the following legislative history:

> The criticism has also been made that, in determining the reasonable needs of

---

* The court adopts the trial judge's findings, but they are not printed since the necessary facts are stated in this *per curiam* opinion including the trial judge's opinion.

the business, consideration has been frequently given to events occurring after the close of the taxable year. Your committee agrees with the House that only the facts as of the close of the taxable year should be taken into account in determining whether an accumulation is reasonable. *If the retention of earnings is justified as of the close of the taxable year, subsequent events should not be used for purposes of showing that the retention was unreasonable in such year. However, subsequent events may be considered to determine whether the corporation actually intended to consummate the plans for which the earnings were accumulated.* (Emphases added.) [S. Rep. 1622, 83rd Cong., 2d Sess. 3 *U.S. Code Cong. & Admin. News*, pp. 4621, 4701 (1954)].

Taxpayer's reliance on the quoted portion of the Senate Report is misplaced because it assumes, contrary to the facts, that it has established in this case that its accumulation of earnings was "justified as of the close of the taxable year" 1970. Although the Code permits a taxpayer to retain accumulated earnings and profits to the extent required to meet the reasonable needs of the business, Treas.Reg. § 1.537–1(b)(1) provides that in order to justify the accumulation, the plans for the future use of the business must be "specific, definite, and feasible" rather than "uncertain or vague." *See Cataphote Corp. v. United States*, 535 F.2d 1225, 210 Ct.Cl. 125 (1976). Here the evidence wholly fails to establish that either during its fiscal year 1970 or in the period from September 1, 1970 to February 3, 1971, taxpayer had formed any plans to use its accumulated earnings for its future business requirements. Rather, as the trial judge found, the taxpayer's president, as early as May 18, 1970, had expressed a wish that the corporation be changed to a personal holding or investment company and the president informed his nephew of this wish in July of 1970. Between August 14, 1970 and August 31, 1970, taxpayer collected its receivables and discharged its payables for the purpose of clearing its books by the end of the fiscal year in order that it could qualify as an investment company for the year 1971. After taxpayer's president died, the previously formed plans to convert the corporation to a securities corporation were adopted by the Board of Directors on October 15, 1970. As early as late October 1970 and certainly not later than February 3, 1971, the taxpayer's Board of Directors had knowledge of the unreasonable accumulation of earnings and profits and of the beneficial tax consequences which would accrue by the failure to pay dividends to the shareholders. As the trial judge found, the taxpayer "developed no specific plans for future development and corresponding reasonable business needs" between September 1, 1970 and February 3, 1971.

Under all the circumstances, the trial judge properly considered events subsequent to the close of the taxpayer's fiscal year in determining whether the corporation was justified in accumulating earnings and profits for the reasonably anticipated future needs of the business. *See C. E. Hooper, Inc. v. United States*, 539 F.2d 1276, 210 Ct.Cl. 615 (1976).

For the reasons stated by the trial judge, plus those set forth above, we hold that plaintiff is not entitled to recover and its petition is hereby dismissed.

## OPINION OF TRIAL JUDGE

BROWNE, Trial Judge: * Plaintiff, JJJ Corporation,[1] seeks recovery of $45,776.10 (together with interest as provided by law) which was assessed against the taxpayer as an accumulated earnings tax penalty under Sections 531 *et seq.* of the Internal Revenue

---

* The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 134(h).

1. A Massachusetts corporation, formerly J. O. Whitten Company, Inc., successor to J. O. Whitten Company, a sole proprietorship unre-

Code[2] for the taxpayer's fiscal year ending August 31, 1970.

The court has jurisdiction of the case under 28 U.S.C. § 1491.

On April 15, 1975, plaintiff filed a motion for partial summary judgment on one count, seeking a determination that it was entitled to an accumulated earnings tax credit of at least $131,800 under section 535(c). Plaintiff asserted entitlement to the credit, the sum being the amount expended by plaintiff pursuant to a section 303 redemption of the capital stock of the deceased president and principal stockholder of the corporation. According to plaintiff's calculations a ruling in its favor would limit the penalty tax, if applicable, to a maximum figure of $2,510.48. The court in an order entered August 1, 1975, denied plaintiff's motion, without prejudice, and remanded the case to the trial division for further proceedings. The case was tried in March of 1976, following which the parties filed their respective post-trial submissions, proposed findings of fact and suggested conclusions of law.

The ultimate issue is whether the plaintiff corporation was "formed or availed of" for the purpose of avoiding income tax with respect to its shareholders during the taxpayer's fiscal year ending August 31, 1970, within the meaning of section 532 of the Code. We conclude that the corporation was availed of for the prohibited purpose and, accordingly, hold for the Government and dismiss the petition. Resolution of the ultimate issue involves the resolution of several subissues, both legal and factual. A summary of the basic facts upon which the foregoing conclusion has been reached and a discussion of the legal and factual issues are presented as follows.

lated to the taxpayer corporation which succeeded it.

2. Except when otherwise indicated, the term "section" refers to a section of the Internal Revenue Code, Title 26, United States Code (1954, *as amended*).

## I. SUMMARY OF THE FACTS.

### A. *Role of William I. Gorfinkle.*

The salient facts in this case revolve around the life and death of William I. Gorfinkle, the late president of the taxpayer corporation.

Prior to 1951 Gorfinkle was brought in as a consultant to a company engaged in the manufacture of gelatin and gelatin products. The company, known as the J. O. Whitten Company, was owned by the Perkins family. In 1951 Gorfinkle brought together a group of investors to buy out and continue operation of the going business under a new and separate Massachusetts corporation of the same name. Gorfinkle was the chief operating officer of the new corporation at the outset. Later he became its president, and eventually he and his wife became the majority stockholders. The company, under Gorfinkle's leadership, actively and continuously engaged in the gelatin manufacturing business until it sold all of its assets to Swift & Co. in May of 1970, the tax year in question. On August 14, 1970, approximately 3 months after sale of the assets and about 2 weeks before the end of plaintiff's fiscal year, Gorfinkle died of heart failure.

Over a period of time the board of directors was reduced from seven members to three members. The three directors at the time of Gorfinkle's death were Gorfinkle, W. O. Whiting[3] and George Naylor, Jr.[4] Whiting and Naylor were only minority stockholders of the corporation. Neither was active in the day-to-day conduct of the business. In fact, Whiting and Naylor functioned primarily in advisory capacities and were not normally known to initiate management policy. The corporation was, in effect, a "one man show," Gorfinkle being the sole "performer."

3. Whiting was employed full time as the chief executive of a well-known food processing business in Massachusetts and was knowledgeable in overall business management.

4. Naylor was a partner in a Boston law firm and served as legal counsel to the J. O. Whitten Company during Gorfinkle's tenure as an officer and director.

While Gorfinkle did not acquire controlling interest in the corporation when it was first organized, he and his wife became the controlling stockholders within about 5 to 6 years after it was formed.[5] Gorfinkle, accordingly, ran the business pretty much to suit himself. He used directors primarily as consultants and displayed a hesitancy to take others into his confidence except to the minimum amount necessary in reaching his own decisions. Gorfinkle employed his nephew, David Gorfinkle, as an administrative assistant. However, he gave David no management responsibilities and did not take him into his confidence with respect to business decisions. He did not discuss business matters with his wife or seek her views on either corporate or personal financial matters even though she was a beneficial owner of a substantial part of their collective equities in the corporation.

In the late 1960's Mrs. Gorfinkle began to urge her husband to retire or at least reduce his business activities to afford them an opportunity to vacation, travel and enjoy the remainder of their lives. The directors, at about the same time, began to urge Gorfinkle to share or delegate his management responsibilities, but primarily for business reasons. They were concerned about the failure of Gorfinkle to train or bring in anyone at the management level who, upon Gorfinkle's absence or retirement, could manage the affairs of the corporation. They did not desire to have the personal responsibility for operations of the corporation in the event something should happen to Gorfinkle. In the alternative, the directors suggested that Gorfinkle sell the business outright.

Gorfinkle, at these urgings, commenced efforts to sell the business. Late in 1969 he located a potential buyer, Swift & Company. During the winter of 1969 and the spring of 1970 he personally conducted negotiations with Swift. These efforts reached a climax in March 1970 and culminated in the sale of the taxpayer corporation's business and its principal assets to Swift & Company effective May 6, 1970.

Although Gorfinkle had never before negotiated the sale of a business, he, nevertheless, conducted all of the negotiations with Swift & Company by himself. During these negotiations Gorfinkle did consult with several persons, including his fellow directors, Whiting and Naylor, but only as to negotiation strategy and mechanics of consummating the sale. Others whom he consulted were Jacob Sherman, a member of the company's retained accounting firm, and Haskell Cohn, an attorney who handled the personal legal affairs of the Gorfinkles.

Gorfinkle sought and received from Sherman and Cohn their respective views and advice with respect to the proposed sale and, more particularly, the tax consequences of a post-sale liquidation of the corporation as compared with the purchase of another business with the proceeds or the continuation of the corporation as a holding or investment company. The financial forecast prepared by the accountants together with the advice of the two lawyers, Naylor and Cohn, indicated that, as far as the tax consequences were concerned, continuation of the company, either as a new business or a holding company, would be better alternatives than liquidation of the company after sale pursuant to section 337. The figures, which were estimates based upon past corporate business and Gorfinkle's past income, forecast that the former alternatives, in comparison with a corporate liquidation, would increase the Gorfinkles' personal (and trust) after-tax proceeds by approximately $240,000 while lessening the minority stockholders' after-tax proceeds by approximately $50,000.

B. *Sale of Assets to Swift & Company.*

In early March 1970 Swift & Company agreed, in principle, to purchase the tangi-

---

**5.** By 1969 Gorfinkle and his wife, collectively, had become the beneficial owners of approximately 72 percent of the issued shares of capital stock of the corporation. The vast majority of this stock was held in separate revocable (marital) trusts. The remaining 28 percent of the stock was held by nine individual shareholders, none of whom were members of Gorfinkle's immediate family.

ble assets of J. O. Whitten Company, Inc., and to retain Gorfinkle as a consultant for 5 years at a fee of $60,000 per year. The directors of J. O. Whitten Company, Inc., met to consider the sale and subsequently notified its stockholders that a stockholders' meeting was to be held on March 17, 1970, to discuss the sale. The meeting originally convened on March 17, 1970, was adjourned on that day and was reconvened on March 23, 1970. Sale of the assets of the corporation to Swift & Company was duly authorized at the reconvened meeting on March 23, 1970.

Robert McCormick, an attorney who served as assistant clerk [6] of the corporation and also rendered some legal services to the corporation, attended the March 17th stockholders' meeting. He advised Gorfinkle that, if the corporation decided to liquidate, it should adopt a section 337 plan in order to lessen taxes on the proceeds. However, at the stockholders' meeting no plan of liquidation was adopted. Gorfinkle represented to the minority stockholders that, if the corporation was not to be liquidated, their shares of stock would be redeemed by the corporation from the proceeds of the sale at a price approximating the book value of the shares.

On May 6, 1970, the taxpayer corporation sold all of its principal assets to Swift & Company at a price of $1.8 million, reserving for itself only certain inventories of gelatin, all accounts receivable and two passenger vehicles. The tangible assets conveyed to Swift included real estate, usable inventory of unfinished products and plant equipment. Swift also acquired the good will of the business, including the J. O. Whitten trade name. All personnel previously employed by the taxpayer were terminated as employees of the taxpayer effective May 6, 1970, and immediately thereafter became employees of Swift & Company. Since the taxpayer had established and operated a profit sharing plan, it was also necessary for that plan to be terminated as of the date of the sale of the business. Gorfinkle, although retained as a consultant, was not continued as an employee of Swift.

Plaintiff changed its name to JJJ Corporation effective May 6, 1970, having given up its rights to the name J. O. Whitten in the sale of its assets to Swift. After the sale of its assets to Swift, plaintiff, among its receivables, retained a substantial claim against an equipment supplier (approximately $300,000). The ordinary accounts receivable and accounts payable (each in the lower six figures) virtually offset each other. The inventory of Kosher gelatin was worth approximately $17,000. The few items of personal property retained were of minimal value.

C. *Disposition of Proceeds from Sale to Swift & Company.*

Faced with the problem of utilizing the proceeds of the sale to the best advantage of the corporation, Gorfinkle consulted with a personal friend and financial advisor, John Wilson, vice president of the New England Merchants National Bank. As a consequence of this consultation, Gorfinkle directed that the proceeds from the sale of the business be invested immediately in short-term municipal securities pending a decision as to the long-range future, if any, of the corporate entity and the ultimate utilization or disposition of the proceeds from the sale to Swift.

As of May 6, 1970, there is no evidence that the taxpayer either through its directors or Gorfinkle, personally, had determined the long-range disposition to be made of the proceeds of the sale. Gorfinkle at one or more times either before or after the sale had made fleeting references to the possible acquisition of a candy company which Gorfinkle would operate. However, since the identity of the prospective acquisition was never established, it cannot be said that anyone gave serious consideration to such an acquisition or to continuing any

---

**6.** The titles "clerk" and "assistant clerk" in Massachusetts correspond to the titles "secretary" and "assistant secretary" in most states.

other form of active manufacturing activity. The amount of time and effort Gorfinkle could contribute to any continuing business would be limited to some extent in view of his consulting agreement with Swift for the succeeding period of 5 years, particularly in view of the $60,000 per year fee to be paid for his services to Swift.

### D. Change In Nature of Corporation's Business.

On May 18, 1970, Gorfinkle wrote a letter to Naylor in which he expressed a wish to change the corporation to a personal holding or investment company and to consider changing the corporation to a Delaware corporation. Naylor responded by letter of May 28, 1970, indicating that the corporation could, with little difficulty, apply to the State of Massachusetts for qualification as a personal holding company for the fiscal year starting September 1, 1970. He further indicated that to incorporate in Delaware would not, without additional changes in the residence of management personnel, lessen the tax consequences to the corporation.

### E. Deterioration of Health, Final Illness and Death of Gorfinkle.

The deterioration of the health of Gorfinkle, the corporation's motivating force and major stockholder, is relevant to this case. In December 1969 Gorfinkle was admitted to Massachusetts General Hospital for a period of 13 days as a result of his complaint of chest pains and difficulty in breathing. A shortness of breath on exertion was the only cardiac symptom observed. The principal diagnosis, on discharge, was that he had a biliary stone in the common duct.

After Gorfinkle left Massachusetts General Hospital he called Dr. Ann Goff, a member of the staff of the Boston University Hospital whom the Gorfinkles had previously met socially. Gorfinkle complained of his health and indicated that he was turning yellow. Dr. Goff suspected that the problem was gall stones and advised Gorfinkle to see a surgeon. In mid-January Gorfinkle entered the Boston University Hospital for a colio-cystectomy, an operation to investigate the presence of gall stone in the common duct. The results were positive.

Gorfinkle subsequently exhibited a decrease in his capacity for work. From time to time between January 1970 and June 1970 Gorfinkle talked with Dr. Goff on the telephone and complained of breathing difficulty. In February 1970 while he and his wife were on a vacation trip in Puerto Rico, Gorfinkle appeared to tire easily, according to his wife, but Mrs. Gorfinkle noted no specific breathing difficulty. Mrs. Gorfinkle did notice that later Gorfinkle did have difficulty breathing and that his condition worsened as time went on. During the period of January to June 1970, Gorfinkle actually reduced his physical activities. He had someone drive his car for him and abbreviated his work day by arriving at work later and going home earlier than was his usual practice.

On May 27, 1970, Gorfinkle was admitted to Massachusetts General Hospital where he underwent an operation for a hernia and the removal of a tumor and some bone cartilage. There is no evidence in the record to indicate that any complications arose during this confinement. Gorfinkle did, however, show some signs of a low grade infection which may have been associated with the tumor which was removed.

After his surgery in May 1970 Gorfinkle complained further to Dr. Goff about his breathing difficulty. Dr. Goff, a pulmonary specialist, ran some tests on Gorfinkle in her laboratory to determine whether or not his breathing problem was lung related. Since the examination results indicated an absence of any adverse lung conditions, Dr. Goff recommended that Gorfinkle consult with Dr. Polansky, a cardiologist.

On the following day, June 26, 1970, Gorfinkle entered Boston University Hospital under the care of Dr. Polansky. On that same day and while in the hospital, Gorfinkle suffered a serious pulmonary embolism which caused an oxygen deficiency for some time. His condition was critical, and his wife and their children were summoned tc

the hospital. Gorfinkle was placed in a coronary intensive care unit for approximately 10 days, during which time he saw no one other than members of the family. He was then transferred to a private room where he was allowed to have a limited number of visitors. Gorfinkle remained in the hospital until his release on August 5, 1970.

During his confinement in the hospital, Gorfinkle's physical and mental condition deteriorated substantially. He was not a cooperative patient and displayed animosity and hostility toward his doctors and nurses. It was the opinion of Dr. Goff that Gorfinkle suffered organic brain damage as a result of the pulmonary embolism which occurred on June 26th. The hospital records, as well as the testimony of Dr. Goff and Mrs. Gorfinkle, establish that he was irrational at times and manifested paranoid symptoms. He displayed irrationality and intermittent periods of apparent rationality, and his periodic paranoia continued for substantially all of his stay in the hospital.

While at the hospital Gorfinkle attended to a limited amount of personal and corporate business during periods of apparent competence. During a visit by Cohn he signed a paper which changed the identity of the trustee of the revocable trust in which the JJJ stock was held for Gorfinkle's beneficial interest. Cohn had prepared the papers pursuant to instructions Gorfinkle had given him before Gorfinkle's last admission to the hospital. On July 14, 1970, Cohn again visited Gorfinkle and obtained his signature to a similar amendment to the Ella Gorfinkle Trust. Thereafter in July Wilson and Cohn visited Gorfinkle together, pursuant to his request, but neither Wilson nor Cohn could recall any business matters of significance that were discussed.[7]

During his hospitalization Gorfinkle discussed a few current business matters with his nephew, David. In July David Gorfinkle sought Gorfinkle's approval of a proposed agreement with the Ross Engineering Company regarding settlement of the claim which the corporation retained after the sale of other assets to Swift. David visited his uncle at the hospital and advised him of the terms of the settlement, to which Gorfinkle passively assented.

Also sometime in July Gorfinkle telephoned his nephew and declared that he wanted the JJJ Corporation to be a private investment company under the control of the Gorfinkle family. Gorfinkle then requested David to write a letter to the minority stockholders offering to redeem their stock. David did nothing to carry out the instructions, however, since he felt the request was out of the ordinary. Moreover, David lacked the necessary background and information to draft a proper letter.

Gorfinkle's doctors felt that further hospitalization would not improve his condition and, at Gorfinkle's request, agreed to discharge him on August 5, 1970. At that time the tests and examinations indicated that Gorfinkle had an aortal aneurism, a history of high blood pressure and probable multiple pulmonary emboli. Gorfinkle had been in heart failure, clinically, for some time and was apparently in progressive heart failure for the last 6 months or so before his death. Barring a miracle, Dr. Goff did not expect him to recover.

During the next week at home, Gorfinkle was bedridden most of the time and under constant nursing care, though in a better frame of mind. He was able to move about in a limited fashion, going to the bathroom or onto a porch adjacent the bedroom. There is no evidence that he had any visitors or transacted any business at his home. Gorfinkle died, suddenly, on August 14, 1970, at the age of 63. The cause of death was given as coronary heart disease.

F. *Windup of Affairs Relating to Sale of Manufacturing Business to Swift & Company.*

JJJ Corporation made no major management decisions or business transactions, as

---

7. Up to this time Cohn was neither a director, officer, shareholder or attorney of JJJ Corporation.

such, from the time of the sale of the assets to Swift to the date of Gorfinkle's death. At no time, either before or after the sale to Swift, did Gorfinkle delegate to anyone the management responsibilities which he exercised as president and chairman of the board of the corporation. There were no directors' meetings between the date of the sale to Swift and the date Gorfinkle last entered the hospital, namely June 26, 1970. The only formal corporate action taken by the directors thereafter (between June 26, 1970 and the date of Gorfinkle's death) occurred on June 29, 1970, at David Gorfinkle's request. On that date the board, without notice to Gorfinkle, gave David the authority to sign checks to be drawn on the bank account of the corporation.

During the summer of 1970 the corporation was winding up its affairs by settling the corporate receivables and payables, selling its inventory of Kosher gelatin, and reaching a settlement of its claim against the Ross Engineering Company. David Gorfinkle, with, when necessary, the assistance of one or both of the board members, pursued these matters to conclusion as of August 31, 1970.

Although Gorfinkle's condition was critical during his last hospitalization, the seriousness of his illness was not generally known outside the family until late July 1970. His nephew David, who visited Gorfinkle at least once, testified that he was not aware of the seriousness of his uncle's condition until mid-July. The taxpayer's directors, Naylor and Whiting, were similarly unaware of the seriousness of his condition. Naylor had no direct contact with Gorfinkle during his entire stay in the hospital or at home thereafter. During the month of July 1970 Whiting was away on vacation and had no business contact with the corporation. When Whiting returned to Boston in late July, Naylor informed him of the seriousness of Gorfinkle's condition.

In July 1970 the accounting firm, which had been retained· by the J. O. Whitten business over the years, prepared an interim financial statement for the corporation as of June 30, 1970. This statement was not a regularly scheduled compilation. The record does not show who requested its preparation, why it was prepared, or who determined the June 30, 1970 cutoff date. The report was first ready for distribution on July 30, 1970. Copies were sent to Gorfinkle and Wilson. Wilson, in turn, sent a copy to Cohn, the Gorfinkles' personal attorney, tax advisor and estate planner. The statements included a balance sheet and a statement of income and retained earnings for the first 10 months of the corporation's 1970 fiscal year (September 1, 1969 to June 30, 1970). The record does not indicate whether or not Gorfinkle did in fact receive or review the reports. Wilson and Cohn do not deny that they received copies, but neither remember reviewing them at that time. Whiting did not receive a copy of the interim statement at any time. Naylor, however, received a copy on or about the day of Gorfinkle's death.

As of the date of Gorfinkle's death the two surviving directors, Whiting and Naylor, had limited financial information at their disposal. The monthly worksheets normally prepared by David Gorfinkle are presumed to have been available on request to the directors as business records of the corporation. The June 30, 1970 interim statement, although in existence at the time of Gorfinkle's death was not previously seen or requested by the two directors. No formal or final financial reports other than the interim statement as of June 30, 1970, was available at the time of Gorfinkle's death or as of the last day of the fiscal year, August 31, 1970.

Between August 14 and August 31, 1970, the corporation collected the remaining receivables and discharged the payables in an effort to totally clear the books by the end of the fiscal year and therefore qualify for the fiscal year 1971 as a securities or investment company under Massachusetts law. A number of final clean-up items were not actually taken care of until August 27, 1970. As of August 31, 1970, the only specific existing unpaid obligations of the taxpayer corporation were state and federal income taxes. Potential obligations includ-

ed contingent liabilities upon warranties made in the contract of sale to Swift and costs to redeem the stock held by minority stockholders and the stock held by Gorfinkle's estate.

### G. *Actions of Board of Directors.*

The two surviving directors held a meeting on August 26, 1970, for the purpose of electing a director to fill the vacancy due to Gorfinkle's death and to authorize the payment of a widow's death benefit in the amount of $5,000 to Mrs. Gorfinkle. The directors elected Wilson, in absentia, to fill the vacancy on the board and to act as temporary president of the corporation. Wilson testified that he considered his major responsibility as president to be the proper management of the corporation's investments.

As of August 31, 1970, the board had made no formal decision to continue the corporation as a closely held investment company. Neither had it decided to dissolve the corporation and distribute the assets or to acquire or establish any other business.

On October 15, 1970, the incumbent board of directors met. At that meeting Whiting resigned as a director and was succeeded by Cohn. Cohn, acting as the Gorfinkles' personal attorney, had already developed an estate plan for the Gorfinkles including the establishment of their revocable marital trusts which, prior to Gorfinkle's death, held the stock of the JJJ Corporation as the only assets. After Gorfinkle's death Cohn became a trustee of these two trusts and the executor under Gorfinkle's will. Cohn, in conjunction with the New England Merchants National Bank as a corporate trustee, held record title to the Gorfinkles' shares in JJJ Corporation. At a meeting held on August 18, 1970 (4 days after Gorfinkle's death) Cohn and representatives of the bank had already discussed the future of the corporation and concluded that continuation of the corporation as a family investment company would be the wisest course to follow. Having the right to vote the controlling shares of the corporation as executor of Gorfinkle's estate and as trustee of the marital trusts, Cohn was in a position to dictate the future of the corporation even before becoming a director.

At the October meeting the newly constituted board (including Cohn) authorized redemption of the stock held by minority stockholders at a price of $36 per share, a price only slightly more than book value. Naylor subsequently sent a letter to the stockholders extending the offer to them and indicating that it was the intent of the corporation to continue exclusively as a securities or investment company.

The financial statements for the year ending August 31, 1970, were not ready for distribution in final form until October 21, 1970. Although the corporate tax return for the 1970 fiscal year would have been due to be filed by November 15th, the corporation requested and was granted an extension of time to February 15, 1971, to file its fiscal 1970 returns. The returns were submitted to the directors for signature on or about November 19, 1970.[8]

On December 14, 1970, the corporation, pursuant to action taken at a meeting of its board of directors, opened an investment agency account with the New England Merchants National Bank. The board authorized Cohn and Wilson, either singly or jointly, to give instructions to the Bank from time to time with respect to the investment and management of the account of the corporation.

Three days later, on December 17, 1970, the JJJ Corporation stockholders elected a board of directors which, in turn, elected officers. The board of directors and officers elected were: Ella Gorfinkle (president), John O. Wilson (treasurer), and Haskell Cohn (secretary and clerk).

In the subsequent fiscal year, 1971, the corporation designated itself in its tax re-

---

**8.** Naylor some time thereafter reviewed the returns. They were ultimately signed by Wilson but not filed until February 3, 1971 (12 days prior to expiration of the extension of time for filing).

turns as a personal holding company for federal income tax purposes and as a securities company for Massachusetts tax purposes. In September 1971 the corporation, pursuant to section 303, redeemed the shares of the corporate stock which were includable in Gorfinkle's estate.

## II. THE ISSUES.

### A. *Accumulated Earnings Tax.*

Section 531 of the Internal Revenue Code defines the mathematical computation of the accumulated earnings tax as imposed upon the accumulated taxable income of a corporation. Section 532 of the Code defines the circumstances under which a corporation is subject to the accumulated earnings tax. The pertinent section, section 532(a), provides:

(a) General rule.

The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

The issue which this court must decide is whether the JJJ Corporation, during its 1970 fiscal year, was availed of for the prohibited purpose. Resolution of this issue is a question of fact to be decided in each case, standing individually on its merits.

The federal tax laws presently establish a disparity between the rates imposed upon the profits of corporations and the higher rates imposed on ordinary income to individuals. Because of the inherent disparity sometimes corporations are unlawfully utilized as instrumentalities to reduce significantly their shareholders' tax liability by accumulating earnings beyond the reasonable needs of the business instead of passing those earnings along to the shareholders. *Ivan Allen Co. v. United States*, 422 U.S. 617, 624, 95 S.Ct. 2501, 45 L.Ed.2d 435 (1975). The purpose of the accumulated earnings tax, imposed in accordance with

section 531, *et seq.*, "is to compel the company to distribute any profits not needed for the conduct of its business so that, when so distributed, individual stockholders will become liable" for taxes on the dividends received. *Helvering v. Chicago Stock Yards Co.*, 318 U.S. 693, 699, 63 S.Ct. 843, 846, 87 L.Ed. 1086 (1943); *John B. Lambert & Associates v. United States*, 212 Ct.Cl. 71, 78 (1976).

 The accumulated earnings tax is actually a penalty rather than a tax, per se. *C. E. Hooper, Inc. v. United States*, 539 F.2d 1276, 1288, 210 Ct.Cl. 615, 636 (1976). Section 532 requires a showing that the corporation allowing an accumulation of earnings and profits does so with a purpose of avoiding income tax with respect to the shareholders. A mere accumulation of an unusually large amount of earnings and profits, without more, does not render the corporation liable for the penalty. The corporate purpose or intent, measured by the purpose or intent of its board of directors and officers, is controlling in determining the lawfulness of the accumulation. However, the forbidden purpose of tax evasion need not be the sole, dominant, controlling or compelling motive. It must only be at least a motive for the accumulation. *United States v. Donruss Co.*, 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969).

Due to the inherent difficulty of proving a corporation's intent or state of mind Congress has imposed a statutory presumption of forbidden purpose whenever corporate actions or conditions fall within specified bounds set forth in the statutes. Section 533 provides:

(a) Unreasonable accumulation determinative of purpose.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate *beyond the reasonable needs of the business* shall be determinative of the purpose to avoid the income tax with respect to shareholders, *unless the corporation by the preponderance of the evidence shall prove to the contrary.* [Emphasis supplied.]

(b) Holding or investment company.— The fact that any corporation is a mere holding or investment company shall be *prima facie evidence of the purpose to avoid the income tax with respect to shareholders.* [Emphasis supplied.]

The defendant contends that both presumptions apply to the present case while plaintiff argues that neither presumption applies and that, even if either or both did, the evidence as a whole rebuts the presumption by a preponderance, as permitted by statute.

B. *Holding Company Issue.*

■ The defendant submits that JJJ Corporation was a mere holding or investment company from the date of the sale of its assets, May 6, 1970, until the end of its 1970 fiscal year, August 31, 1970, a period slightly less than 4 months. It further contends that a factual holding that the plaintiff was a mere holding or investment company for all of the last quarter of its tax year is sufficient, legally, to invoke the presumption of prohibited purpose provided for in section 533(b). A finding in favor of defendant on this latter point would also minimize the amount of accumulated earnings credit to which a corporation, if found liable for the accumulated earnings tax, would be entitled. I.R.C. § 535(c)(3). We disagree with defendant as to its conclusion on the facts of this case and find that the JJJ Corporation was not, at any time during its 1970 fiscal year, a "mere holding or invest-

ment company" within the meaning of section 533(b).

Clearly, when a corporation throughout its fiscal year has activities which fall within an accepted definition of a holding or investment company,[9] the statutory presumption imposed by section 533(b) does and should apply. However, when the corporation, as in the present case, sells its going business during the course of its fiscal year and does not engage in any other business during the remainder of the year, the issue is less clear both legally and factually. Legally, the issue is whether the mere holding or investment company test should be applied at all or whether the focus should instead be only upon the unreasonable accumulation issue (section 533(a)).

Whether a company is, in fact, a *mere* holding or investment company requires an interpretation of the Treasury Regulations both as to the nature of its activities and the period of time it engages in such activities during the fiscal year involved.[10]

After the sale of its assets to Swift the JJJ Corporation immediately invested the proceeds of the sale in municipal bonds as a shortterm investment. By June 30th 98 percent of the total assets of the corporation were liquid, and by August 31, 1970, its assets were 100 percent liquid. For the period of May 6, 1970 to August 31, 1970, plaintiff realized approximately $29,000 in tax-free interest income from these investments.[11] During the same period the corpo-

---

**9.** Although the Internal Revenue Code does not specifically define a holding or investment company, the Treasury Regulations do provide definitions of these terms. Section 1.533–1(c) defines a holding company as a "corporation having practically no activities except holding property and collecting the income therefrom or investing therein * * *." That same regulation defines an investment company as one in which the activities consist "substantially of, buying and selling stocks, securities, real estate, or other investment property * * * so that the income is derived not only from the investment yield but also from profits upon market fluctuations * * *." Treas.Reg. § 1.533–1(c) (1960).

**10.** It would not make sense to treat a corporation as a *mere* holding or investment company if it started its fiscal year with capital derived from buying, selling or exchanging securities

during the previous year and used that capital to buy out and operate an established manufacturing business as its only activities during the rest of the tax year. Conversely, if it sells a going business and merely places the proceeds in short-term, tax-free securities for a reasonable period pending a decision as to its future, the corporation would not be "availed of" for the purpose of avoiding tax for its stockholders.

**11.** Since the income from the securities was tax-free, it would not have produced any more tax revenue if the same amount of money had been invested in the same kinds of securities by the shareholders. Thus the corporation did not save its shareholders any tax liability in the course of conserving the corporate assets pending a decision as to dissolution or continuation of the corporation.

ration also attended to other routine matters such as closing out its receivable and payable accounts, settling its claim against the Ross Engineering Corporation, selling its inventory of Kosher gelatin, and generally winding up its affairs connected with the going business which it had sold.

As of August 31, 1970, the plaintiff's activities and holdings were such that it would objectively fit within the accepted definition of a holding or investment company. However, the fact that the taxpayer, JJJ Corporation, as of August 31, 1970 (and perhaps as early as May 7, 1970) objectively was *capable* of being a holding or investment company does not establish that it *was*, in fact, a mere holding or investment company as that term is used in section 533(b). The period of time during which the corporation was *capable* of operating as a holding or investment company (*i. e.*, May 7, 1970 to August 31, 1970) and the particular circumstances surrounding the corporation's activities during that period are critical factors.

Defendant relies upon *Alex Brouwn, Inc. v. Commissioner*, 60 T.C. 364 (1973), *aff'd per curiam*, 496 F.2d 621 (6th Cir. 1974) as precedent for the proposition that operation of a corporation as a holding or investment company for only *some part* of its fiscal year is sufficient to invoke the presumption of purpose provided by section 533(b). Plaintiff contends that the present case is distinguishable on the facts.

In *Brown, supra*, the taxpayer corporation, in an arm's-length transaction, sold all of its physical assets, goodwill, finished goods and inventories to another corporation 5 months prior to the end of its fiscal year. During the remaining 5 months of its fiscal year the taxpayer corporation invested the proceeds of the sale in interest-bearing government securities and took no affirmative action to develop any other future plans for its future activities. The Tax Court held that (1) the corporation failed to establish any reasonable needs for its accumulation, and (2) "as a fact (and petitioner has not argued otherwise) that

petitioner became 'a mere holding or investment company' " *as of the date of sale* and remained so throughout the remainder of its fiscal year. *Alex Brown, Inc. v. Commissioner, supra*, 60 T.C. at 367. The court held that sections 533(a) and (b) applied and, since the corporation did not rebut the statutory presumptions of purpose, the government prevailed.

While we agree with the application of the section 533(a) presumption in *Brown*, we do not consider the facts in that case to be "on all fours" with or sufficiently similar to the facts in the present case to warrant application of section 533(b) in this case.

In *Brown, supra*, the petitioner did not contest the court's finding that it was a mere holding or investment company during the relevant tax period. In the present case the plaintiff hotly debates the issue of status of the taxpayer corporation during the relevant tax period. In *Brown, supra*, the corporation management and, in particular, its largest stockholder chose not to devise specific plans other than continuing as an investment company. In making a positive determination to make no change in its activities, the corporation, in effect, elected to be treated as a mere holding company.

On the other hand Gorfinkle, the sole moving force in JJJ Corporation, was critically ill for 2 of the 4 months in issue. The other board members took little, if any, initiative before Gorfinkle's hospitalization. They acted primarily as invited advisors. It was not until they were compelled by circumstances beyond their control that they elected successor directors. It was the successor directors who made the formal decision, after August 31, 1970, to operate the corporation as a mere holding or investment company.

While the section 533(b) presumption might apply in a case in which a corporation, during the fiscal year at issue, sells its assets and continues to act during the ensuing tax period as a holding or investment company, we find that it does not apply to

this case. It is appropriate in this case to focus attention instead on the reasonableness of the accumulation in comparison with the anticipated needs of the corporation in light of section 533(a). As will become evident, the application of section 533(a) to the facts of this case serves the same purpose as does section 533(b) and makes unnecessary a resolution of the thorny factual and legal issues presented by section 533(b).

### C. Reasonableness of Accumulation of Profits and Earnings.

Section 533(a) applies if the earnings and profits of a business corporation are permitted to accumulate beyond the *reasonable needs* of the business.[12] Accumulations necessary to satisfy reasonable needs of a business are defined in section 537 as follows:

(1) the reasonably anticipated needs of the business,

(2) the section 303 redemption needs of the business, and

(3) the excess business holdings redemption needs of the business.

In this action we are concerned only with paragraphs (1) and (2).

The "reasonably anticipated needs" test allows the corporation to accumulate earnings and profits for future needs, but the plans for using the accumulation must be specific and definite rather than uncertain or vague. *Cataphote Corp. v. United States,* 535 F.2d 1225, 1234, 210 Ct.Cl. 125, 139 (1976). It is not necessary for the corporation to produce meticulously drawn formulae or blueprints for action. Rather the test is whether proposed expansion or expenditure appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations." *Faber Cement Co. v. Commissioner,* 50 T.C. 317, 332–33 (1968). A taxpayer may not use changed circumstances or subsequent intentions to rationalize the accumulation of earnings

and profits. *Stevenson v. United States,* 378 F.2d 354, 355 (2d Cir. 1967).

In this court the burden of proof is upon the taxpayer to justify its accumulations as being not more than necessary for its reasonable needs. Plaintiff has established contingent liabilities for federal and state taxes of approximately $530,300. It also paid allowable redemption costs of $131,800 under section 303. The former figure is undeniably a reasonable business need. The redemption costs are also a reasonable business need since such costs are specifically so defined under section 537(b)(2). That section expressly provides that needs necessitated by section 303 redemptions are reasonable business needs and does not require (as does section 537(b)(1)) that the exact amount or even the certain event of redemption be anticipated.

Plaintiff has failed to establish any other reasonable business needs. The corporation has not shown any realistic consideration of a proposed conversion or expansion into another business. Therefore, the *Bardahl Mfg. Corp. v. Commissioner,* 24 Tax Ct. Mem.Dec. 1030 (1965) working-cycle formula need not be applied. In effect, the taxpayer's reasonable needs for its future operations (as a family investing company) are zero. Plaintiff indicated, largely as an afterthought, that it conceivably might be held liable to some unknown extent for warranties made in the sale to Swift. However, it presented no specifics as to the degree or probability of these contingencies. Finally, it would seem that any funds accumulated for the redemption of stock from minority stockholders would not qualify as a reasonable business need but would be viewed as an expenditure of corporate funds for the ultimate personal convenience and benefit of Mrs. Gorfinkle and the minority stockholders. *See John B. Lambert & Associates v. United States, supra.* Furthermore, plaintiff has not asserted that this expenditure was a reasonable business need.

---

**12.** A mere holding or investment company, as distinguishable from a business corporation, is not entitled to accumulate profits or earnings.

Thus, determination of reasonableness of such a company's needs is moot. I.R.C. § 533(b).

■ Plaintiff, therefore, has established reasonable business needs approximating $662,100. If plaintiff's accumulation of earnings and profits exceed these reasonable business needs, section 533(a) imposes upon plaintiff a presumptive purpose of avoiding tax. The parties disagree as to the construction and application of this section. Defendant contends that the reasonable business needs must be compared with the total accumulation, at the end of the fiscal year, of earnings and profits of the past as well as the present years. According to defendant's calculations the resultant figure for the JJJ Corporation would be $1,729,181.52. Plaintiff contends that the proper comparison figure would be only the earnings and profits accumulated in the fiscal year 1970, the tax year in issue. Plaintiff's figure of accumulated profits and earnings would be $782,871.27.[13]

We find that the total accumulation of earnings and profits over the years, including the tax year, is the proper figure. If the accumulated earnings from previous years are sufficient without the implementation of any additional accumulation of the earnings of the taxable year, then there is no necessity to retain any portion of the current year's earnings and profits. *Electric Regulator Corp. v. Commissioner*, 40 T.C. 757, 765 (1963); *Bahan Textile Machinery Co. v. United States*, 453 F.2d 1100, 1102 (4th Cir. 1972).

Under defendant's formula and computation the plaintiff's accumulation of earnings and profits, $1,729,181.52, clearly exceeds its reasonable needs of $662,100. The presumption of prohibited purpose provided by section 533(a) applies.[14]

D. *Computation of Tax, If Imposed.*

■ The parties differ as to the computation of tax, if imposed. The Internal Revenue Service, pursuant to section 535, calculated the accumulated taxable income to be $140,929.03. Plaintiff contends that this figure should be further adjusted through the use of an accumulated earnings credit equal to at least the value of plaintiff's section 303 redemption needs ($131,800). Pursuant to section 535(a) the accumulated earnings credit is one of the many figures subtracted from the taxable income before arriving at the accumulated taxable income subject to the tax calculated pursuant to section 531. In this case the accumulated earnings credit, contrary to plaintiff's view, is zero.

Section 535(c) defines the accumulated earnings credit. The paragraph pertinent to this case is section 535(c)(1): [15]

(1) General Rule.—For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b)(6). For the purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561) for such year.

For the fiscal year in question the deduction allowed under subsection 535(b)(6) was $573,219.15. The Internal Revenue Service,

---

**13.** This figure, as well as defendant's proposed figure, was taken from a financial statement showing plaintiff's financial status as of August 31, 1970. Neither party has disputed the accuracy of these figures.

**14.** Even under the plaintiff's proposed formula, its accumulation of earnings and profits exceeds its reasonable business needs. Also, plaintiff's assertion that section 303 redemption needs are in some manner special reasonable business needs which are not to be compared with the accumulated earnings and prof-

its from past years but instead are to be compared with the earnings and profits accumulated in the year of the stockholder's death, is without merit and contrary to the statutes as written.

**15.** In this case the minimum accumulated earnings tax credit, section 535(c)(2), would be zero since the accumulated earnings and profits of the taxpayer in the preceding tax year, $946,310.25, exceed $100,000.

pursuant to section 535(a), properly subtracted this amount from the taxable income. Assuming for the moment that the section 303 redemption needs of $131,800 were "an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business," from this $131,800 would be subtracted $573,219.15. Under this assumption, most favorable to plaintiff, it still would be entitled to no accumulated earnings credit.

Defendant further contends, and we agree, that the section 303 redemption needs in this case would not qualify as the "amount" as defined in section 535(c)(1). The section 303 redemption figure is a reasonable business need, but that amount must be compared with the accumulated earnings and profits of prior years as well as those of the year in question. Treas.Reg. 1.535–3(b)(ii) (1959). Plaintiff contends that the Treasury Regulation is inapposite and argues that the legislative history of the 1969 amendment, adding section 537(b), supports its assertion. Plaintiff appears to allege that Congress when amending section 537 intended that the amount of money spent toward a section 303 redemption be treated as an accumulated tax credit, regardless of other earning and profit accumulations or other long-term capital gain offsets (section 535(b)(6)).

The language of section 535(c)(1) does not support plaintiff's theory; nor does the legislative history of that section or of section 537(b). Congress, in 1969, added section 537(b) to settle a conflict as to whether a section 303 redemption need was or was not a reasonable business need. While Congress clearly defined such a redemption to be a reasonable business need, it did not give this reasonable business need any special status. All reasonable business needs, whether defined in paragraphs (1), (2) or (3) of section 537, are treated the same. When Congress added section 537(b), it did not amend section 535; nor does the legislative history of the section 537(b) amendment indicate that Congress desired that the unchanged section 535 be applied or interpreted differently. Treasury Regulation 1.535–3(b)(ii) applies. Since the accumulation of earnings and profits from the previous year, $946,310.25, more than covers the reasonable business needs which we have determined to be $662,100, the "amount" of earnings and profits for the taxable year retained for the reasonable needs of the business would be zero.

We conclude that the Internal Revenue Service correctly computed the accumulated tax penalty which it imposed upon plaintiff and that the presumption imposed by section 533(a) applies. The sole remaining issue is whether the plaintiff, by the preponderance of the evidence, has rebutted the presumption of prohibited purpose.

### E. *Purpose of Accumulation.*

The accumulated earnings tax is a penalty tax which presupposes some deliberate purpose to evade shareholder taxes. *Hooper v. United States, supra,* 539 F.2d at 1288, 210 Ct.Cl. at 636. At least one purpose of the accumulation must be the prohibited one. *United States v. Donruss Co., supra,* 393 U.S. at 309, 89 S.Ct. 501. Because of its accumulation of earnings and profits beyond its reasonable business needs, plaintiff is presumed to have had a prohibited purpose. Despite this presumption, section 533(a) provides the taxpayer with a "last clear chance" to show that the accumulation was not inspired by tax avoidance considerations. *John B. Lambert & Associates v. United States, supra,* 212 Ct.Cl. at 84. Plaintiff contends, in rebuttal, that the purpose or intention of tax evasion never crossed its officers' or directors' minds.

The real issue present is why did the JJJ Corporation allow its earnings and profits to accumulate rather than be paid to the corporate stockholders as dividends. As of August 31, 1970, the JJJ Corporation, itself, had not developed any specific, definite plan to enter into another business and had accumulated earnings and profits beyond its reasonable business needs. Ideally, the unreasonable accumulation should have been distributed to the corporation's stock-

holders. Since the corporation's accumulation of earnings and profits exceeded its reasonable business needs, the presumption imposed by section 533(a) is that the corporation intended to avoid taxes with respect to its shareholders by withholding the dividends.

1. *Time Frame During Which the Corporate Purpose is Measured.*

The parties appear to disagree as to the time frame in which the corporate state of mind, measured by the intentions and actions of its officers and board members, should be weighed. Plaintiff asserts that the intentions formed and the actions taken by the corporation itself, only during and up to the end of the fiscal year in question, control. Defendant, at least indirectly, proposes that a longer time frame is appropriate. We hold that the corporate intent as to its tax motives is measured by the intentions and actions of the corporate directors and officers made from the first day of the fiscal year in question up to the date the corporation files its final tax return for that fiscal year. We further hold that the court may determine the intentions and actions of the corporation by evidence of actions taken or intentions expressed by a director prior to his election as a director of the corporation when acting in a fiduciary capacity on behalf of shareholders. In this case the period during which evidence of intent is admissible would run from September 1, 1970 to February 3, 1971.

Often, as is readily exemplified by this case, a corporation has no clear understanding of its financial status or its tax liabilities until sometime after the close of its fiscal year. If, before filing its tax returns, it finds that it has, indeed, accumulated earnings and profits beyond its reasonable needs, Congress has, in its wisdom, granted the corporation a means to lawfully avoid some, if not all, of the accumulated earnings tax. The corporation may declare dividends to its shareholders on or before the 15th day of the third month following the close of its fiscal year and treat those dividends as if paid during the fiscal year in question. I.R.C. § 563. If a corporation, having an unreasonable accumulation of earnings and profits, fails to declare a late dividend and instead simply files its tax returns, the intentions and actions of its officers and directors up to the date of signature are relevant to the corporate tax motives. If, as of the date of signature, some or all of the officers or directors were not only aware of the corporation's unreasonable accumulation but also aware of the tax effect of the accumulation on controlling shareholders, the corporation is deemed to have been "availed of" for the purpose of reducing the tax liability of its shareholders.

The time-frame rule presented in this opinion should not demand that a corporation which sells its assets during a fiscal year blindly make hasty decisions as to its future operation or its tax planning. In such circumstances a corporation should have some "breathing period" in which to determine its future course of action. It cannot, however, in Rip Van Winkle style unreasonably delay its decision and then rely upon its indecision as a defense against the accumulated income tax penalty. *Alex Brown, Inc. v. Commissioner, supra,* 60 T.C. at 368. After its breathing spell, the duration of which is dependent upon the particular circumstances of each case, the corporation must make a decision as to its future and be bound by the tax consequences of that decision or indecision. Where, after the breathing spell, the corporation has invested its unreasonable accumulated income into passive assets and has developed no specific plans for future development and corresponding reasonable business needs, the accumulated income tax is properly imposed. *Alex Brown, Inc. v. Commissioner, supra; Rhombar Co. v. Commissioner of Internal Revenue,* 386 F.2d 510 (2d Cir. 1967); *Mimmac Corp. v. Commissioner,* 41 T.C.M. (P–H) ¶ 72,096 (1972).

2. *Role of Officers and Directors in Determining Purpose.*

Applying the time-frame test explained in the previous section, we find that the

plaintiff corporation by late October 1970 had clearly planned to continue as a securities or investment corporation and that its breathing spell had ended at least by that time. The actions of the board clearly evidence the intention to operate as an investment company. We further find that plaintiff has failed to show that, during the appropriate time period, none of its officers or directors had knowledge of the corporation's unreasonable accumulation or the corresponding favorable tax consequences to the shareholders. The latter finding requires further discussion.

The officers and directors who served at various times during the period from September 1, 1969 to February 3, 1971, include Messrs. Gorfinkle, Naylor, Whiting, Wilson, Cohn and Mrs. Gorfinkle. Before Gorfinkle's death the three incumbent directors were Gorfinkle, Naylor and Whiting. As of August 31, 1970 (after the death of Gorfinkle) they were Naylor, Wilson and Whiting. As of October 15, 1970 (as a consequence of the resignation of Whiting) they were Naylor, Wilson and Cohn. As of December 17, 1970 (as a consequence of Naylor's resignation) they were Mrs. Gorfinkle, Wilson and Cohn. Mrs. Gorfinkle, Wilson and Cohn remained the directors on the date that the corporate tax form was filed, February 3, 1971. Thus, as of that date the board was composed of the principal beneficiary of trusts holding all the stock of the corporation (Mrs. Gorfinkle), the trustee of those trusts and executor of the estate of Gorfinkle (Cohn) and an officer of the bank which served as the corporation's investment agency and co-trustee of the Gorfinkles' trusts (Wilson).

We go so far as to conclude that Mrs. Gorfinkle, Gorfinkle and Whiting had never seriously considered payments of dividends nor had full knowledge of the financial condition of the corporation on or before August 31, 1970. Gorfinkle, who normally initiated the declaration of dividends,[16] was dangerously ill prior to his death, and we draw no inference other than a neutral intent from his actions and inactions. We also conclude that Mrs. Gorfinkle's lack of knowledge or active participation in the business of the corporation continued at least up to the date the tax form was filed, despite the fact that she was elected to the board of directors and was designated the corporation's nominal president on December 17, 1970. Whiting acted primarily as an advisor and was absent during much of the latter period of the 1970 fiscal year before his resignation on October 15, 1970.

Naylor, Wilson and Cohn remain. We find that these three board members, either in conjunction or singly, as early as late October and certainly prior to February 3, 1971, at least had knowledge of the corporation's unreasonable accumulation of earnings and profits and the beneficial tax consequences to the shareholders of not declaring and paying dividends to the shareholders. As of late October these members had access to the complete financial statements for the year ending August 31, 1970. Also in October these three board members concluded that it was in the best interest of the firm to continue as a family investment company. Naylor acted throughout his membership on the board as legal counsel to the corporation (but not to the Gorfinkles personally) and certainly had some understanding of corporate taxation as it applied to the JJJ Corporation. He reviewed the tax forms in question before Wilson signed them. Wilson may not have been an expert in tax law, but he certainly understood corporate finances, at least in a general way by virtue of his experience as a trust officer

---

**16.** The corporation's dividend policy varied over the years. During the period of 1958 through 1965 dividends were declared and paid semi-annually in varying amounts. The total annual dividends paid during that period were:

| | |
|---|---|
| 1958—$9,200.00 | 1962—$9,524.00 |
| 1959—9,325.00 | 1963—9,016.00 |
| 1960—8,258.00 | 1964—8,246.00 |
| 1961—9,856.00 | 1965—3,965.50 |

These dividends represented an average of approximately 13 percent of the corporate net earnings after taxes for each year. After the 1965 fiscal year the taxpayer's "one man" management changed the dividend policy of the company. No dividends were declared or paid, but instead the accumulated earnings were retained to provide operating cash and to purchase replacement and new equipment.

of a large bank. Cohn had developed the Gorfinkles' estate plan and their two revocable marital trusts, was trustee of those trusts and executor of the Gorfinkle estate. He had studied the tax consequences on his clients (the Gorfinkles) of the possible liquidation of the corporation after the proposed (and ultimately consummated) sale of the assets to Swift & Co. In October he became a director of the corporation and proposed that the corporation continue as a family investment company. He was acutely familiar with the finances and taxation of both the corporation and the Gorfinkle properties. The combined knowledge and actions of Cohn, Naylor and Wilson certainly evidence knowledge of the corporation's accumulation and the corresponding tax benefits to the shareholders and could easily be considered to support a finding of intent to avoid taxation. We need not reach the latter finding since the former is sufficient.

We hold that the plaintiff has failed to rebut the presumption imposed by section 533(a). This court in *John B. Lambert & Associates v. United States, supra,* 212 Ct.Cl. at 85 stated:

> \* \* \* [T]he presumption of a tax avoidance purpose that arises under Section 533 on the basis of a finding of an unreasonable accumulation is a formidable one to overcome; and, when further buttressed by proof of actual knowledge of the favorable tax consequences to the shareholders of such accumulations, it becomes imperative that the proof demonstrate reasonably definite grounds from which to infer the existence of a contrary purpose. \* \* \*

Plaintiff has failed to demonstrate any reasonably definite grounds from which we can infer the existence of a contrary purpose. Our conclusion is further supported by the *Brown, supra,* and *Mimmac, supra,* cases.

### CONCLUSION OF LAW

Upon the findings of fact, which are made a part of the judgment herein, and the foregoing opinion, the court concludes

as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

