**ATLANTIC COMMERCE & SHIPPING CO., INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 1164, Docket 73–2637.

United States Court of Appeals, Second Circuit.

Argued June 12, 1974.

Decided July 31, 1974.

Arthur L. Harrow, New York City, for appellant.

James T. Bozarth, Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks and Jonathan S. Cohen, Attys., Tax Div., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before LUMBARD, HAYS and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

The Atlantic Commerce and Shipping Co., Inc., (Atlantic) appeals from a decision of the United States Tax Court which upheld the Commissioner of Internal Revenue's determination that Atlantic owed the additional tax on accumulated earnings imposed by Int.Rev.Code of 1954, § 531. Following a one-day trial on May 22, 1972, Judge Bruce M. Forrester filed an opinion on May 7, 1973, which held that the Commissioner had correctly found deficiencies of $21,057.98 and $18,360.63 in Atlantic's income tax for the years 1965 and 1966, respectively, because the corporation had been availed of for the purpose of avoiding income tax with respect to its shareholders. 30 CCH Tax Ct.Mem. 473. We affirm.

Atlantic is involved in the ship brokerage business. Its president, George S. Pathy, owned 98.75 per cent of its stock in 1965 and 1966; Pathy's brother, Ladislas, owned the remainder. The Pathy family has been in the international shipping business for 50 years and controls several corporations in the business. For example, George Pathy is also president of Federal Commerce and Navigation Co., Ltd. (Federal Commerce), a large Canadian corporation in international shipping and the principal source of Atlantic's brokerage income.

Initially after its formation in 1941, Atlantic was primarily engaged in the ownership of ocean-going vessels. Later it became a charterer of vessels instead, but chartering left Atlantic vulnerable to the economic cycles of international shipping. The years 1960, 1961, and 1962 were poor ones for the shipping industry

and Atlantic suffered substantial operating losses. In an effort to minimize its exposure to such losses in the future, Atlantic in 1962 decided to devote itself to furnishing brokerage and management services to other shippers. This transformation was completed by the end of 1963.

Prior to 1963 Atlantic needed capital in excess of $200,000 to conduct a chartering business, but much less capital was needed to conduct a brokerage business. Rather than distribute this excess capital to its shareholders Atlantic decided instead to diversify by retaining its capital and investing in real estate. Beginning in 1962 and continuing through 1972 Atlantic examined various real estate investment opportunities throughout the United States and Canada. In addition to consulting its attorneys and its bank about possible investments, it retained an investment broker in New York and a real estate firm in Toronto to search for sound investments. From 1962 to 1966 Atlantic examined at least 30 or 40 real estate investment proposals, including a hospital, shopping centers, medical buildings, a post office, and office buildings. Despite this extensive search the only real estate investment made by Atlantic was its purchase together with another Pathy enterprise of a factory building in Brooklyn in October 1967. This purchase was largely financed by mortgage loan.

In 1965 Atlantic invested $53,158.43 in the purchase of Federal Commerce stock. In 1966 it purchased an additional $18,119.44 worth of Federal Commerce stock. In 1965 the Pathy family organized Federal Marine Terminals, Inc., (Federal Marine) to acquire marine terminals and operate them for Federal Commerce. Atlantic contributed $25,000 to Federal Marine's capital. Subsequently in 1968, Atlantic purchased a crane for $172,990.27 and leased it to Federal Marine for use at its Chicago terminal.

Atlantic did not pay any dividends (other than a stock dividend) to its shareholders in 1965 and 1966. Indeed, it had not paid any dividends during its entire corporate existence until 1967. Atlantic's working capital at the beginning of 1965 and 1966 exceeded $300,000, nearly all of which was represented by cash and marketable securities.

Section 532 of the Internal Revenue Code imposes the accumulated earnings tax of § 531 on a corporation when it is "availed of for the purpose of avoiding the income tax with respect to its shareholders . . . ." Section 533 provides that the fact that the earnings and profits have accumulated beyond the reasonable needs of the business is determinative of the purpose to avoid income tax with respect to shareholders unless the corporation proves the contrary by a preponderance of the evidence. The reasonable needs of the business includes the "reasonably anticipated needs of the business." Int.Rev.Code of 1954, § 537 (a)(1). The Commissioner has the burden of proving accumulation beyond the reasonable needs of the business if the taxpayer has submitted a statement in accordance with § 534 of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to show that earnings and profits have not accumulated beyond the reasonable needs of the business.

■ As we have previously noted, decisions in accumulated earnings tax cases turn largely on the facts regarding the particular business involved. Sears Oil Co. v. Commissioner, 359 F.2d 191, 193 (2d Cir. 1966). The Tax Court found here that the earnings and profits had been accumulated beyond the reasonable needs of Atlantic's business and that Atlantic had not shown by a clear preponderance of the evidence that this accumulation was not for the purpose of avoiding income tax with respect to its shareholders. We cannot set aside these findings of fact unless we are convinced that they are clearly erroneous. See Int.Rev. Code of 1954, § 7482(a); F.R.Civ.P. 52 (a). Our careful review of the record leads us to the conclusion that the Tax

Court's findings were not clearly erroneous.

The first issue confronting the Tax Court was whether Atlantic's accumulation of its 1965 and 1966 earnings when it already had $300,000 in working capital was unreasonable. The first ground urged by Atlantic to show the reasonableness of its further accumulation was its planned diversification into real estate. The Tax Court held that Atlantic's statement under § 534 was sufficient to place the burden of proof on this point on the Commissioner but that the Commissioner had carried this burden.

■ The Tax Court held that further accumulation for this purpose was unreasonable because Atlantic was interested only in passive investments in real estate unrelated to its business. See Treas.Reg. § 1.537–2(c)(4). This finding was not clearly erroneous. Although Pathy in a letter to Atlantic's Toronto real estate agent indicated that Atlantic was interested in acquiring waterfront terminal facilities, it is undisputed that Atlantic investigated a large number of possible investments unrelated to shipping. There is no indication in the record that Atlantic would have been capable of actively managing any of these properties as a new line of business.

In any event, the Tax Court also found that the accumulation was unreasonable because the plans for diversification were indefinite and vague. Treas.Reg. § 1.537–1(b)(1). Again this finding was not clearly erroneous. The record indicates that Atlantic had no specific plans for investment but was examining a wide range of possible activities. It is also noteworthy that when Atlantic did invest in real estate in 1967, its investment was largely financed by mortgage rather than by prior accumulations. In order for the further accumulation of earnings in 1965 and 1966 to be reasonable, the plans for investment must be more definite than was the case here. See Dixie, Inc. v. Commissioner, 277 F.2d 526 (2d Cir.),

cert. denied, 364 U.S. 827, 81 S.Ct. 62, 5 L.Ed.2d 54 (1960); I. A. Dress Co. v. Commissioner, 273 F.2d 543 (2d Cir.), cert. denied, 362 U.S. 976, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960); Cheyenne Newspapers, Inc. v. Commissioner, 494 F.2d 429 (10th Cir. 1974); Henry Van Hummell, Inc. v. Commissioner, 364 F.2d 746 (10th Cir. 1966), cert. denied, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102 (1967).

■ Atlantic also argued below that it planned to diversify by making further investments, other than its initial contribution to capital in 1965, in Federal Marine. The Tax Court held that Atlantic's § 534 statement did not shift the burden to the Commissioner on this issue. Since the statement contained no facts indicating that Atlantic intended in 1965 or 1966 to invest further in Federal Marine, we hold that the Tax Court correctly placed the burden of proof concerning this issue on Atlantic. On the merits The Tax Court found that although George Pathy testified that there was an understanding that Atlantic would help finance Federal Marine, there was no objective evidence of this and that it was likely that the investment in the crane in 1968 was made only because Atlantic had nothing better to do with its steadily mounting excess funds. This finding was not clearly erroneous.

■ Atlantic also argued that it was entitled to accumulate its earnings to provide a reserve against possible losses caused by a future downturn in the shipping industry. The Tax Court found that the switch to a brokerage operation had virtually eliminated the possibility of large operating losses and that further accumulation of funds to meet this possibility was not reasonable. In view of the some $300,000 Atlantic had in working capital at the beginning of 1965, this finding was not clearly erroneous.

■ Finally, Atlantic urged that its accumulation was reasonable because as

a matter of law it was entitled to rely on guidelines which allow accumulation of sufficient earnings to pay one year's operating expenses or to maintain current assets at a level of two and one half times its current liabilities. The Tax Court correctly rejected reliance on these administrative guidelines, which can only aid and not replace examination of the needs of the particular business. Dixie, Inc. v. Commissioner, *supra,* 277 F.2d at 528. The Tax Court here found that Atlantic's actual working capital needs did not exceed $20,000.

■ Having rejected Atlantic's arguments that its accumulation in 1965 and 1966 was reasonable, the Tax Court then determined that Atlantic had not shown by a preponderance of the evidence that lessening George Pathy's income tax was not one of its purposes in failing to distribute its earnings in 1965 and 1966. See United States v. Donruss Co., 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969). This finding was not clearly erroneous. Atlantic urges here that Pathy's purpose in allowing the accumulation of funds was to save his business and that if Pathy had been concerned with lessening his income taxes he would have withdrawn capital from Atlantic in 1962 when its accumulated earnings were about $30,000. As the Tax Court noted, this argument is of little relevance to what Pathy's and Atlantic's intentions were in 1965 and 1966 when there was a substantial accumulation of earnings.

Atlantic also argues that Atlantic had no purpose to avoid dividend taxes in 1965 because its investments that year in Federal Commerce and Federal Marine exceeded its net income. The Tax Court, however, found that after deducting these investments from the earnings accumulated prior to 1965 there were sufficient funds to meet the reasonable needs of the business without accumulating any more funds. Since George Pathy's income taxes would have increased $41,404.75 and $39,635.95, respectively, in 1965 and 1966 if Atlantic had distributed its total earnings for those years, it is almost impossible to conceive that avoiding dividend taxes was not at least one motive behind Atlantic's further accumulation.

Accordingly, the Tax Court did not err in imposing the accumulated earnings tax and its judgment is affirmed.