\*Doug-Long, Inc., Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 11051–76.     Filed April 23, 1979.

*Thomas Hogan, Joseph A. Wagda, Jr.,* and *David A. Brady,* for the petitioner.

*David R. Smith,* for the respondent.

Hall, *Judge:* Respondent determined the following deficiencies and additions for accumulated earnings taxes for petitioner:

| Year | Deficiency | Accumulated earnings tax |
|------|-----------|--------------------------|
| 1972 | $209.84 | $12,020.25 |
| 1973 | 0 | 10,168.85 |
| 1974 | 8,387.70 | 29,869.56 |

Due to concessions, the issues for decision are whether petition-

*Supplemental Opinion appears at 73 T.C. 71 (1979).

er, who owned and operated a "truck stop," is liable for the accumulated earnings tax imposed by section 531[1] for 1972, 1973, and 1974, and if so, the extent of such liability. In order to resolve these issues, we must consider the following subsidiary questions:

A. Whether petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business.

(1) Whether petitioner had a reasonable need to accumulate its earnings (and the amount of such reasonable accumulations) for:

(a) a reserve to purchase extra inventory of fuel;

(b) construction of a truck service-repair facility;

(c) an addition to a building which petitioner leased to the U.S. Postal Service;

(d) installation of a vapor emission recovery system; and

(e) in 1974, the purchase of the first mortgage debt owed by a principal trade debtor.

(2) What were petitioner's working capital needs for one operating cycle? Specifically, we must consider the application of the so-called *Bardahl*[2] formula to this case.

(3) Whether petitioner reasonably accumulated its earnings and profits in 1972 and 1973 in order to comply with the dividend guideline imposed by the Federal Government under the Economic Stabilization Act of 1970.

B. Whether petitioner was availed of for the purpose of avoiding income tax with respect to its shareholder during the years in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

Petitioner is a domestic corporation incorporated under the laws of the State of New York. During the years in issue, its principal place of business was near Watertown, N.Y. Petitioner

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

[2] See *Bardahl Manufacturing Corp. v. Commissioner*, T.C. Memo. 1965–200 (24 T.C.M. 1030, 34 P–H Memo T.C. par. 65,200); *Bardahl International Corp. v. Commissioner*, T.C. Memo. 1966–182 (25 T.C.M. 935, 35 P–H Memo T.C. par. 66,182).

reports its income and expenses and files its income tax returns using the accrual method of accounting and the calendar year.

Petitioner was formed in 1965 by G. Douglas Longway (Longway), who was petitioner's president and sole shareholder throughout the years in issue. Petitioner's primary business activity was the operation of a truck stop and service station. Petitioner provided fuel, parts, and repair services to long-haul truckers, as well as gasoline to automobiles, at a major highway intersection in upstate New York. The truck stop also had a diner which petitioner leased to a third party. In addition, at that site petitioner owned a building which was leased to the U.S. Postal Service as a U.S. Mail Regional Distribution Center.

## A. Reasonable Needs of Petitioner's Business[3]

The years in issue were difficult for gasoline and diesel fuel dealers. In 1973, the Federal Government instituted a program of voluntary allocation of fuel supplies; this was followed by the Arab Oil Embargo in late 1973 and early 1974. Nevertheless, petitioner's business grew throughout these years. Petitioner's sales of gasoline and diesel fuel expressed in gallons, petitioner's gross sales of gasoline, diesel fuel and other automotive products, expressed in dollars, and petitioner's taxable income were as follows:

| Year | Gasoline | Diesel fuel | Gross sales | Taxable income[4] |
|------|----------|-------------|-------------|---------------|
| 1972 | 1,248,695 gals. | 2,016,373 gals. | $1,043,924 | $80,964 |
| 1973 | 1,121,641 gals. | 2,313,002 gals. | 1,301,329 | 104,331 |
| 1974 | 1,063,785 gals. | 2,847,206 gals. | 2,065,292 | 206,453 |

Petitioner purchased gasoline and diesel fuel from two major suppliers, Texaco and Augsbury Oil (Chevron), plus other lesser suppliers. Petitioner received its supplies during the years in issue from the following sources:

---

[3]The parties have stipulated that petitioner had a reasonable need to retain the following amounts for the purpose of new equipment purchases in subsequent years:

| Year | Amount |
|------|--------|
| 1972 | $9,717 |
| 1973 | 8,203 |
| 1974 | 19,340 |

[4]Petitioner's taxable income also includes the net proceeds from rents from the diner and the U.S. Postal Service Distribution Center. Gross rents collected were $49,946 in 1972, $56,351 in 1973, and $59,586 in 1974.

GASOLINE

| Year | Texaco | Augsbury Oil (Chevron) and miscellaneous "Spot Market" | British Petroleum (economy station) |
|------|--------|--------------------------------------------------------|-------------------------------------|
| 1972 | 641,486 gals. (Jan.-Oct.) | 135,209 gals. (Oct.-Dec.) | 472,000 gals. |
| 1973 | 308,550 gals. (July-Dec.) | 797,091 gals. (all year) | [1]16,000 gals. |
| 1974 | 649,189 gals. (all year) | 414,596 gals. (all year) | --- |

[1]Ceased delivery January 1973.

DIESEL FUEL

| Year | Texaco | Augsbury Oil (Chevron) and miscellaneous "Spot Market" |
|------|--------|--------------------------------------------------------|
| 1972 | 1,509,175 gals. | 507,175 gals. (Oct.-Dec.) |
| 1973 | 563,900 gals. (part July-Dec.) | 1,749,102 gals. (all year) |
| 1974 | 2,583,678 gals. (all year) | 263,528 gals. (Jan.-Apr.) |

Petitioner's fuel business was divided into two distinct portions: cash sales[5] of gasoline and diesel fuel to automobile drivers and independent truckers, and credit sales (under "letter form" contracts) of diesel fuel to trucks belonging to major trucking companies. Approximately one-third of petitioner's sales were on credit, and 90 percent of these credit sales were to large trucking companies. Petitioner also contracted to provide repair service to these trucking firms.

1. Specific Needs

(a) *Fuel inventory.*—During the years in issue, petitioner had difficulty obtaining all the fuel it could sell. The primary causes of this were the Federal Government's voluntary fuel allocation program and the Arab Oil Embargo.[6] Under the allocation program, dealers were supposed to receive 100 percent of their 1972 supplies—but 1972 was a year of low fuel consumption in petitioner's area. Supplies provided were often below this requirement. Petitioner's troubles were compounded by the fact that one of its suppliers, British Petroleum, ceased deliveries in January 1973.

Moreover, petitioner was engaged in several long-standing disputes with its major supplier, Texaco, during the years in issue. In 1965, Longway entered into a written 10-year contract with Texaco for the purchase of gasoline, diesel fuel, and other miscellaneous items. In 1973, Longway filed a complaint against

[5]Sales on "credit cards" are included in cash sales.
[6]After the oil embargo began, the voluntary fuel allocation program became mandatory.

Texaco, which was settled out of court. In addition, Longway attempted to terminate his contract with Texaco in 1969 and 1972, but on both occasions Texaco refused to terminate the contract. Finally, in 1974, Texaco notified petitioner that Texaco intended to terminate the 10-year contract. Texaco's action was in accordance with its post-Arab Oil Embargo policy of terminating all long-term contracts in order to enter into new contracts which provided for supply shortages. Despite these actions, Texaco never intended to cut off petitioner's fuel supply, and Texaco continued to supply petitioner with gasoline, diesel fuel, and other petroleum products in accordance with existing allocation programs.

In the face of fuel shortages, Longway briefly searched for alternative sources of supply. Longway and Mr. Ryan, another service station operator in his area, called a fuel broker in Virginia in mid–1973 to inquire about bulk purchases of gasoline and diesel fuel from independent refiners. They were informed that the minimum purchase of any type of fuel was 1 million gallons. This amount far exceeded their storage ability.[7] Moreover, neither petitioner nor Mr. Ryan could afford to purchase such large quantities of fuel, ship it to upstate New York, store it and then sell it at a competitive price. Accordingly, Mr. Ryan abandoned his effort to find an alternative source of supply. Longway gave up the search not long thereafter.

Since petitioner was not able to purchase in bulk, it searched for other sources of supply closer to home. In 1973, petitioner began purchasing diesel fuel from Augsbury Oil (Chevron), and in 1973 Augsbury Oil supplied 75 percent of petitioner's diesel fuel needs.

In spite of these problems, petitioner's sales *increased* throughout the years in issue. Even during the Arab Oil Embargo, petitioner ran out of fuel only a few times. Petitioner's success in obtaining supply was due to the efforts of Longway, who managed to obtain fuel when many other dealers were "dry." Longway was able to obtain fuel during these difficult times despite the fact that petitioner was not a "priority user" under the mandatory allocation program. Payments for "extra fuel" had to be made in cash.

---

[7] Petitioner had storage tanks which held 52,000 gallons of fuel.

(b) *Truck service-repair facility.*—As part of petitioner's contracts with major trucking firms, petitioner was obligated to provide maintenance service and repairs to truckers. Petitioner performed part of these services and repairs at its small facility and subcontracted the remaining repairs to other garages in its area. Throughout the period in issue, however, petitioner intended to build a larger truck service-repair facility as soon as it was able to employ a competent mechanic. Longway (who had previously been in the construction business) estimated the cost of such a facility at $75,000. After petitioner employed a competent mechanic, petitioner built the building which was completed in 1977.

(c) *Addition to the building leased to the U.S. Postal Service.*— In 1965, petitioner leased a building to the U.S. Postal Service for 10 years. In 1972, the lessee mentioned to Longway that if the lease were renewed, an additional 3,000 square feet of floor space would be needed. Longway gave the Postal Service's rental officer an estimate of the rental cost with the additional square footage. However, the Postal Service's plans were indefinite in 1972 and have remained that way. In 1975, the Postal Service renewed the lease for 3 years, with options to extend. At the time of this renewal, the Postal Service did not require the extra square footage.

(d) *Installation of a vapor emission recovery system.*—In the early 1970's, Longway became concerned that petitioner might have to install a vapor emission recovery system to reduce pollution from petroleum fumes. He did not plan to have petitioner install such a system, however, until or unless New York State required it. New York did not then, and does not now, require such systems. In 1975 (a year after the latest year in issue), the Federal Environmental Protection Agency proposed regulations requiring vapor emission recovery systems, but these regulations have run into considerable opposition and had not been adopted by the time of trial or since.

(e) *Purchase of Van Tassel first mortgage.*—Mr. Walter Van Tassel owned and operated a moving and storage business and independent trucking business near petitioner's truck stop. Van Tassel purchased on credit from petitioner fuel and other supplies needed in his business. The trucking business, however, was not profitable. In 1974, Van Tassel fell behind in his payments to petitioner, and at the end of that year he owed

petitioner $16,025.70. Van Tassel's obligation was approximately 25 percent of petitioner's accounts receivable at the end of 1974. The National Bank of Northern New York held a first mortgage against Van Tassel's property in the amount of approximately $27,000 and, in 1974, the bank began foreclosure proceedings against Van Tassel. Longway feared that if the bank foreclosed on Van Tassel, petitioner would realize nothing on its unsecured debt.

In response to the bank's foreclosure proceedings, petitioner took three actions to protect its position. First, petitioner claimed a bad debt deduction on its 1974 corporate income tax return in the amount of $16,025.70. Second, petitioner obtained from Van Tassel a second mortgage on his property to secure this indebtedness. This mortgage was recorded on February 19, 1975. Third, petitioner sought to purchase from the bank the first mortgage against Van Tassel's property. Petitioner began to plan its purchase of this first mortgage in 1974. Petitioner purchased this mortgage from the bank in August 1975 for $26,398.[8] By 1977, Van Tassel had paid off the second mortgage debt, but the first mortgage debt remained outstanding.

## 2. Petitioner's Working Capital Requirements

Petitioner's president and sole shareholder, Longway, was in the construction business before he formed petitioner; from his experience in the construction business, he was accustomed to retaining large amounts of liquid assets in his business. Longway quit the construction business in 1965 and formed petitioner at that time. Since then, petitioner has retained considerable liquid assets. Petitioner's current assets, current liabilities, quick assets, current asset to current liability ratio, and quick asset to current liability ratios at the end of each of the years in issue were as follows:

|  | | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| (a) | Current assets | $285,071 | $364,080 | $516,915 |
| (b) | Current liabilities | 61,533 | 100,179 | 156,447 |
| (c) | Quick assets (current assets less receivables and inventories) | 245,315 | 299,738 | 448,421 |
| (d) | Current asset to current liability ratio | 4.63:1 | 3.63:1 | 3.30:1 |

---

[8] In 1975, petitioner learned of tax liens outstanding against Van Tassel's property.

(e) Quick asset to current
    liability ratio .........................   3.99:1    2.99:1    2.87:1

Petitioner's available working capital at the close of each of the years in issue was as follows:

| Year | Working capital |
|------|-----------------|
| 1972 | $221,253 |
| 1973 | 263,901 |
| 1974 | 360,468 |

The parties agree that we should use the so-called *Bardahl* formula to determine petitioner's working capital needs during the years in issue; they disagree as to the mechanics of the formula. In the margin we have set forth the parties' calculations.[9] Most of the facts upon which these calculations are based

---

[9]

**Respondent's Computation of Petitioner's Working Capital Needs Under Bardahl**

| | 1972 | 1973 | 1974 |
|---|---|---|---|
| 1. Operating expenses for full year including cost of goods sold ......................................... | $1,019,991 | $1,261,480 | $1,933,855 |
|   Less: Depreciation included in line 1 ..................... | 12,546 | 13,947 | 13,802 |
| 2. Operating expenses as adjusted ............................. | 1,007,445 | 1,247,533 | 1,920,053 |
| 3. Operating business cycle | | | |
|   (a) Cost of goods sold ......................................... | 879,305 | 1,090,737 | 1,712,721 |
|   (b) Peak month inventory .................................... | 10,507 | 10,777 | 18,735 |
|   (c) Line (b) divided by line (a) .............................. | .01195 | .00988 | .01094 |
|   (d) Net sales for the year (per returns) ................... | 1,043,924 | 1,301,329 | 2,065,292 |
|   (e) Peak month accounts receivable (yearend) ............. | 29,249 | 53,564 | 49,759 |
|   (f) Line (e) divided by line (d) ............................. | .02801 | .04116 | .02409 |
|   (g) Line (c) plus line (f) ..................................... | .03996 | .05104 | .03503 |
|   (h) Average credit period .................................... | 10 days | 10 days | 10 days |
|   (i) Line (h) divided by 365 .................................. | .0273 | .0273 | .0273 |
|   (j) Line (g) minus line (i) = operating cycle expressed as percentage of year ....................... | .01266 | .02374 | .00773 |
| 4. Line 2 (succeeding year) multiplied by line 3(j) equals amount of working capital needs for one operating cycle ..................................... | 15,794 | 45,582 | 14,525 |

**Petitioner's *Bardahl* Formula: Current Year's Expenses Versus Subsequent Year's Expenses**

| | 1972 | 1973 | 1974 |
|---|---|---|---|
| 1. Operating expenses for full year including cost of goods sold ......................................... | $1,019,991 | $1,261,480 | $1,933,855 |
|   Less: Depreciation included in line 1 ..................... | 12,546 | 13,947 | 13,802 |
|   Add: Federal estimated income taxes for year ........... | 19,500 | 32,000 | 40,600 |
| 2. Operating expenses for year as adjusted ................... | 1,026,945 | 1,279,533 | 1,960,653 |
| 3. Operating business cycle | | | |
|   (a) Cost of goods sold ......................................... | 879,305 | 1,090,737 | 1,712,721 |
|   (b) Inventory - end of year (except 1974; use Nov.) ...... | 10,507 | 10,777 | 18,735 |
|   (c) Divide line (b) by line (d) ............................... | .01195 | .00988 | .01094 |
|   (d) Net credit sales for year ................................ | 308,257 | 474,180 | 757,465 |

are not in dispute, and we have made the following findings concerning the disputed facts:

*Estimated income taxes.*—Petitioner's estimated income tax payments for the years in issue were as follows:

| Year | Estimated tax |
|------|---------------|
| 1972 | $19,500 |
| 1973 | 32,000 |
| 1974 | 40,600 |

*Accounts receivable.*—Petitioner's peak accounts receivable were at yearend and were as follows:

| Year | Accounts receivable |
|------|---------------------|
| 1972 | $29,249 |
| 1973 | 53,564 |
| 1974 | 49,759 |

*Peak month inventory.*—Petitioner's peak month inventories, including fuel and other automotive supplies, were as follows:

| Year | Inventory |
|------|-----------|
| 1972 | $10,507 |
| 1973 | 10,777 |
| 1974 | 18,735 |

Petitioner's tire inventories are included in these peak month inventories.

---

| | | | |
|---|---|---|---|
| (e) Accounts receivable (peak month = Dec., except Nov. 1974) | 29,249 | 53,564 | 70,000 |
| (f) Divide line (e) by line (d) | .0949 | .1129 | .0924 |
| (g) Add lines (c) and (f) | .10685 | .12278 | .10334 |
| (h) Average credit period extended by suppliers | 10 days | 10 days | 10 days |
| (i) Divide line (h) by 365 | .0273 | .0273 | .0273 |
| (j) Subtract line (i) from line (g) - (resulting figure (usually a decimal) gives operating cycle expressed as part of the year) | .07955 | .09548 | .07604 |
| 4. (a) Gross sales of "Truck Stop" products—line 1, page 1, Form 1120 | 1,043,924 | 1,301,329 | 2,065,292 |
| (b) Line 3(d), divided by line 4(a) = credit sales as percent of gross sales | 29.5% | 36.4% | 36.7% |
| (c) Line 4(b) times line (2) equals operating expenses allocated to credit side of truck stop business | 302,949 | 465,750 | 719,560 |
| 5. Multipy line 4(c) for current year by line 3(j) for current year | 24,100 | 44,470 | 54,715 |
| 6. Multiply line 4(c) for subsequent year by line 3(j) for current year | 37,050 | 68,703 | 54,340 |

3. Dividend Guidelines

In 1971, petitioner paid Longway a dividend of $7,300. In light of the wage-price freeze in effect in 1972, petitioner's accountant advised Longway that the same dividend ($7,300) should be paid in that year, and such dividend was paid.

Petitioner's taxable income, taxes paid, and net income as reported on its returns were as follows:

| Year | Taxable income | Taxes paid | Net income |
|------|---------------|------------|------------|
| 1971 | $63,592.42 | $23,695.90 | $39,896.52 |
| 1972 | 80,964.00 | 32,158.00 | 48,806.00 |
| 1973 | 104,331.00 | 43,041.00 | 61,290.00 |

B. *Purpose and Intent*

As we noted above, Longway believed in retaining large amounts of liquid assets in his business. The following table shows the amounts of petitioner's retained earnings at the end of each of its taxable years 1969 through 1974:

| Taxable year | Retained earnings | Taxable year | Retained earnings |
|------|---------------|------|------------|
| 1969 | $137,890.56 | 1972 | $255,355.12 |
| 1970 | 178,437.12 | 1973 | 291,902.92 |
| 1971 | 212,289.82 | 1974 | 381,983.50 |

Prior to 1971, petitioner paid no dividends to Longway. For each of its taxable years 1971 through 1974, inclusive, petitioner declared and paid a dividend of $7,300 to Longway. These dividends equaled 14 percent of petitioner's net income after taxes in 1972, 16 percent in 1973, and 7 percent in 1974. These dividends were not determined on the basis of petitioner's earnings and profits but, rather, represented 10 percent of Longway's original contribution to petitioner.[10]

Moreover, petitioner's total payments to Longway did not change substantially during the years in issue. Petitioner's distributions to Longway, including compensation and dividends, were as follows:

---

[10]Longway purchased petitioner's capital stock in 1965 for $73,000.

| Year | Compensation | Dividend | Total |
|------|--------------|----------|-------|
| 1969 | $13,000 | 0 | $13,000 |
| 1970 | 23,400 | 0 | 23,400 |
| 1971 | 23,400 | $7,300 | 30,700 |
| 1972 | 18,920 | 7,300 | 26,220 |
| 1973 | 19,120 | 7,300 | 26,420 |
| 1974 | 18,920 | 7,300 | 26,220 |
| 1975 | 65,100 | 21,900 | 87,000 |

In 1975, after a conference with one of respondent's agents, petitioner increased both the compensation and dividend paid to Longway. At that time, Longway was reluctant to increase his compensation and the dividend. In 1976, in order to avoid accumulated earnings problems, petitioner elected subchapter S status.

Although petitioner paid only minimal dividends to Longway, during the years in issue petitioner had loans outstanding to Longway in amounts varying between $70,000 and $100,000. Longway held the borrowed funds in 90-day certificates of deposit at a local bank; he paid petitioner interest, ranging from $4\frac{1}{2}$ to 5 percent, on these loans. Longway kept for his personal use any additional interest received on the certificates of deposit in excess of the amount paid petitioner.

In 1971, petitioner began trading in the stock market. Petitioner opened an "investment management account" at a local bank which purchased and sold securities in publicly-traded corporations for petitioner's account. At the end of each of the years in issue, petitioner owned blocks of common stock in at least a dozen corporations in such diverse lines of business as banking, building/construction, electronics, textiles, chemicals, automotive, and public utilities. Petitioner also invested in convertible debentures, convertible preferred stock, and tax-exempt municipal bonds.

During the years in issue, Longway's taxable income and marginal tax bracket were as follows:

| Year | Taxable income | Marginal tax bracket |
|------|----------------|----------------------|
| 1972 | $52,656 | 53% |
| 1973 | 45,583 | 50% |
| 1974 | 65,032 | 55% |

If all of petitioner's available earnings and profits during the

years in issue had been distributed to Longway in the form of dividends, his additional individual income tax liability for those years would have been as follows:

| Year | Corporate net income | Net income available for distribution | Shareholder tax liability per return | Additional tax liability of shareholder |
|---|---|---|---|---|
| 1972 | $80,964 | $41,506 | $18,408 | $22,927 |
| 1973 | 104,331 | 53,990 | 14,852 | 30,034 |
| 1974 | 206,453 | 106,789 | 27,329 | 70,148 |

## C. *Notice of Deficiency*

On November 26, 1975, respondent informed petitioner that a proposed statutory notice of deficiency for the taxable years 1972 through 1974 included amounts with respect to the accumulated earnings tax under section 531. Petitioner timely submitted a statement, as provided in section 534(c), setting forth the grounds on which it relied to establish that all or part of its earnings had not been permitted to accumulate beyond the reasonable needs of its business. In this statement, petitioner set forth the following grounds for its accumulation:

(a) development and expansion of its business;
(b) supply and fuel inventory problems;
(c) vapor emission recovery system;
(d) increased parking space;
(e) construction of a truck service-repair facility (estimated cost—$70,000);
(f) the Van Tassel obligation.

On September 21, 1976, respondent mailed petitioner a statutory notice of deficiency in which respondent determined that petitioner was liable for the accumulated earnings tax imposed by section 531. On August 22, 1977, this Court held that the burden of proof is on petitioner as to whether its earnings and profits were permitted to accumulate beyond the reasonable needs of its business.

## OPINION

The issues for decision in this case are whether petitioner is liable for accumulated earnings taxes for 1972, 1973, and 1974, and, if petitioner is, the amount of such tax.

Section 531 imposes an accumulated earnings tax on every

corporation formed or availed of for the purpose of avoiding tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed.[11] The existence of accumulations beyond the reasonable needs of the business establishes that such a purpose exists. Sec. 533(a). However, to the extent that a corporation retains all or any part of its earnings and profits to meet the reasonable needs of its business, such amounts are allowed as a credit against its accumulated taxable income which is subject to the accumulated earnings tax. Sec. 535.

### A. *Reasonable Needs of Petitioner's Business*

Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable needs is a question of fact. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938); *Bremerton Sun Publishing Co. v. Commissioner*, 44 T.C. 566, 582 (1965). The mere magnitude of the accumulated earnings and profits is not determinative; rather, the determinative question is whether the accumulation exceeds the reasonable needs of the business. *Bremerton Sun Publishing Co. v. Commissioner, supra* at 582; *Faber Cement Block Co. v. Commissioner*, 50 T.C. 317, 328–329 (1968); *Smoot Sand & Gravel Corp. v. Commissioner*, 274 F.2d 495, 500–501 (4th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 362 U.S. 976 (1960). In considering this factual issue, we recognize that, in general, it is the responsibility of the corporate officers and directors to determine the needs of a particular business. Nonetheless, in this case we have previously ruled that petitioner bears the burden of proving that its accumulations were for the reasonable needs of its business.

Section 537(a)(1) specifically provides that reasonable needs of

---

[11]Secs. 531 and 532(a) provide:

SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) $27\frac{1}{2}$ percent of the accumulated taxable income not in excess of $100,000, plus

(2) $38\frac{1}{2}$ percent of the accumulated taxable income in excess of $100,000.

SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

the business include "reasonably anticipated needs of the business." Section 1.537–1(b)(1), Income Tax Regs., in pertinent part states:

In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. * * * Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

In other words, a specific, definite, and feasible plan for the use of an accumulation of earnings and profits is required. *Estate of Lucas v. Commissioner*, 71 T.C. 838, 853 (1979); *Atlantic Commerce & Shipping Co. v. Commissioner*, 500 F.2d 937, 940 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; *Dixie, Inc. v. Commissioner*, 277 F.2d 526 (2d Cir. 1960), affg. 31 T.C. 415 (1958), cert. denied 364 U.S. 827 (1960); *I. A. Dress Co. v. Commissioner*, 273 F.2d 543 (2d Cir. 1960), cert. denied 362 U.S. 976 (1960); *JJJ Corp. v. United States*, 217 Ct. Cl. 132, 576 F.2d 327 (1978). In a closely held corporation, however, this plan does not have to be inscribed in formal minutes. *John P. Scripps Newspapers v. Commissioner*, 44 T.C. 453, 469 (1965). Instead, "the intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose." *Smoot Sand & Gravel Corp. v. Commissioner*, 241 F.2d 197, 202 (4th Cir. 1957), affg. in part a Memorandum Opinion of the Court, cert. denied 354 U.S. 922 (1957).

1. Specific Needs

In this case, petitioner has set forth five specific needs, in addition to its need for working capital, which petitioner contends were reasonable needs of its business within the meaning of section 537.[12] Respondent, on the other hand, contends (1) that petitioner lacked specific, definite, and feasible plans for its accumulated earnings and profits, and (2) that if petitioner had plans, its business needs were less than petitioner

---

[12]In addition to these five needs, the parties have stipulated that petitioner was entitled to accumulate $9,717 in 1972, $8,203 in 1973, and $19,340 in 1974 for new equipment purchases in subsequent years.

claims. Since we do not agree totally with either party, we will examine each of petitioner's claimed business needs in detail.

(a) *Fuel inventory.*—Petitioner's first contention is that it needed to accumulate its earnings in order to be able to augment its fuel inventory. Petitioner contends, primarily, that it needed sufficient funds to purchase 1 million gallons of gasoline and 1 million gallons of diesel fuel—the minimum amounts which petitioner could purchase from an independent refiner. Petitioner asserts that this fuel would cost in excess of $400,000. Respondent, on the other hand, contends that petitioner never had a specific, definite, or feasible plan to make large fuel purchases. Although we agree with respondent for the most part, we conclude that in 1973 and 1974 petitioner had a reasonable need to accumulate $40,000 to purchase extra fuel.

In the first place, it is clear on the facts of this case that petitioner never formed a definite plan to purchase fuel from an independent refiner. Longway (and another fuel dealer, Mr. Ryan) did inquire as to the costs of such fuel, but the result of this inquiry was that both petitioner and Mr. Ryan abandoned any hopes of independently bringing fuel to the area. Put simply, the cost of such independent action was prohibitive. Petitioner realized that it could not transport fuel to upstate New York, store it, and then sell it at a competitive price.

Petitioner argues, nonetheless, that its contingent plan to independently transport fuel to upstate New York justifies an accumulation of almost $400,000. We disagree. Mere discussions of ideas, and obtaining cost estimates, are not definite plans within the meaning of section 537. *Dixie, Inc. v. Commissioner, supra* at 528; *I. A. Dress Co. v. Commissioner, supra* at 544. Petitioner's plans to bring fuel to upstate New York never progressed beyond this vague "talk" stage. Accordingly, petitioner did not have a reasonable need to accumulate $400,000 in order to transport fuel to its place of business.

On the other hand, we do not agree with respondent that petitioner should not have accumulated any liquid assets in order to purchase extra fuel. The years 1973 and 1974 were very difficult years for fuel dealers. In early 1973 the Federal Government promoted a voluntary fuel allocation program and, after the Arab Oil Embargo in late 1973 and early 1974, this allocation program became mandatory. Under this program petitioner received, at most, only 100 percent of its 1972 fuel

purchases. Nevertheless, in 1973 and 1974 petitioner's business (and volume of fuel sales) increased. Apparently petitioner increased its business by purchasing extra fuel from independent suppliers or on the "spot" market. Such extra fuel could only be purchased for cash.

If a business's source of supply suddenly becomes (or appears to become) unstable, such a business has a reasonable ground to accumulate liquid assets in order to purchase supplies. *Dielectric Materials Co. v. Commissioner*, 57 T.C. 587, 599 (1972); *Bardahl Manufacturing Corp. v. Commissioner*, T.C. Memo. 1965–200 (24 T.C.M. 1030, 34 P–H Memo T.C. par 65,200). In this case, it cannot be denied that petitioner's source of supply became questionable after the Arab Oil Embargo. Moreover, petitioner has shown that it was engaged in a running controversy with its major supplier, Texaco. Although Texaco did not intend to cut off petitioner's supplies, we infer from the evidence presented at trial that Texaco also was not likely to increase petitioner's supplies above those required under the allocation program.

On the basis of this evidence, we conclude that petitioner reasonably accumulated some of its earnings in order to purchase extra fuel from independent suppliers or on the "spot" market. As to the reasonable amount of such accumulation, we conclude, on the basis of all the facts, that petitioner was entitled to accumulate $40,000 for this purpose. Since petitioner continued to receive fuel from Texaco under the allocation program, petitioner needed to accumulate only the amount necessary to purchase additional fuel at the end of each month when its supplies, received under the allocation program, ran short. For $40,000 petitioner could purchase at least 100,000 gallons of fuel, which would allow petitioner to fill its 52,000 gallon storage tanks twice. On the basis of a comparison of petitioner's fuel sales in 1972 and later years, we conclude that such an accumulation was sufficient to fund petitioner's purchases of fuel when its allotments were insufficient.

(b) *Truck service-repair facility.*—On brief, respondent concedes that petitioner was entitled to accumulate its earnings and profits for the construction of a truck service-repair facility. The parties now disagree only as to the amount which petitioner could accumulate: respondent says $70,000, petitioner says $75,000–$80,000. Respondent bases his figure on the section 534(c) statement which petitioner submitted prior to trial;

petitioner bases its figure on the testimony at trial. On the basis of all the evidence presented, we conclude that petitioner reasonably accumulated $75,000 in each of the years in issue for construction of the truck service-repair facility.

(c) *Addition to the building leased to the U.S. Postal Service.*— Petitioner contends that it had a reasonable need to accumulate $40,000 for a 3,000-square-foot expansion of the building which it leased to the U.S. Postal Service. In support of this claim, petitioner points to the conversation which Longway had with the Postal Service's rental officer in which the rental officer indicated that the Postal Service would need this additional space. Petitioner and the Postal Service had a 10-year lease which expired in 1975, and petitioner now contends that it had to accumulate its earnings in order to build this addition for the Postal Service when the lease expired. Longway also testified, however, that the Postal Service's plans were, and have remained, "indefinite."

On the basis of this evidence, we conclude that petitioner lacked a specific and definite plan to build an addition to the building leased to the Postal Service. See *Estate of Lucas v. Commissioner, supra; Atlantic Commerce & Shipping Co. v. Commissioner, supra; Dixie, Inc. v. Commissioner, supra.* Petitioner would have built an addition to this building only if required to do so by its tenant, and during the years in issue its tenant's plans were indefinite. In his talk with the rental officer, Longway merely recognized a possible future need to construct the addition; petitioner made no definite plans to do so. Moreover, although hindsight is not controlling (*Faber Cement Block Co. v. Commissioner*, 50 T.C. 317, 333 (1968)), we note that the Postal Service renewed its lease without requiring additional space; this fact highlights the indefinite nature of petitioner's plans to build the addition.[13] Accordingly, we hold that petitioner did not have a reasonable need to accumulate funds in order to build an addition to the building it leased to the U.S. Postal Service.

(d) *Installation of a vapor emission recovery system.*—Petitioner contends that it had a reasonable need to accumulate $40,000 for installation of a vapor emission recovery system. In

---

[13]We also note that petitioner failed to list this need in its sec. 534(c) statement. Although this fact is not determinative, it leads us to suspect that petitioner conjured up this "need" when it received the notice of deficiency, not before.

the early 1970's, Longway became concerned that petitioner might have to install such a system; however, Longway did not plan to have petitioner install such a system until or unless New York required it. The State of New York has never required petitioner to install this system. Longway did not know what system, if any, might eventually be required or what it would cost. On the basis of this evidence, we conclude that petitioner's plan to install a vapor emission recovery system was, at best, vague and indefinite. *Estate of Lucas v. Commissioner, supra.* Accordingly, we hold that petitioner did not during the period in issue have a reasonable need to accumulate funds in order to install a vapor emission recovery system.

(e) *Purchase of the Van Tassel first mortgage.*—Petitioner contends that it had a reasonable need to accumulate $27,000 in 1974 to purchase the first mortgage outstanding against a major trade debtor, Van Tassel. Respondent contends that petitioner's only proper course of action was to deduct the amount of Van Tassel's obligation—approximately $16,000—when the debt became worthless.[14]

In 1974, Van Tassel, who was a major trade debtor of petitioner's, was in financial trouble. The local bank, which had a first mortgage on Van Tassel's property, began foreclosure proceedings against Van Tassel. In order to protect its position, petitioner took three actions: first, petitioner deducted Van Tassel's debt as a bad debt; second, petitioner obtained a second mortgage against Van Tassel's property; and third, petitioner sought to purchase the outstanding first mortgage held by the bank. The reason petitioner sought to purchase the first mortgage was that Longway feared that petitioner would realize nothing on its obligation if the bank foreclosed.

In 1974, petitioner formulated a definite plan to make a "loan" to its debtor, Van Tassel, by purchasing the first mortgage.[15] Petitioner took this action to protect its business; hindsight shows that petitioner followed through with this plan. See *Faber Cement Block Co. v. Commissioner,* 50 T.C. 317, 333 (1968).[16] Action taken to prevent the worthlessness of outstanding trade

---

[14]Petitioner claimed a bad debt deduction for this debt in 1974, but respondent disallowed the deduction. Petitioner does not contest respondent's action.

[15]Petitioner did not learn of tax liens on the building until 1975 and, therefore, had no plan to purchase these liens in 1974.

[16]In fact, hindsight reveals the success of petitioner's tactics since Van Tassel completely repaid the trade debt by 1977; the first mortgage debt was still outstanding.

obligations is a part of a corporation's business, within managerial discretion. Accordingly, we hold the petitioner had a reasonable need to accumulate $27,000 in 1974 to purchase the first mortgage outstanding against Van Tassel's property.[17]

2. Working Capital Needs

Petitioner's working capital needs for one operating cycle are a reasonable business need. *Magic Mart, Inc. v. Commissioner*, 51 T.C. 775, 791–793 (1969). The parties agree that we should use the *Bardahl* formula to determine petitioner's working capital needs, but they disagree as to the mechanics of the formula. In our findings of fact we have set forth the parties' proposed *Bardahl* computations.

Under the *Bardahl* formula, a corporation's working capital needs are the amount of working capital necessary for one operating cycle. In the case of a mercantile business, like petitioner, the operating cycle begins with the purchase of inventory and ends with the collection of the accounts receivable resulting from its sale. The cycle is reduced, however, by the time that the corporation's creditors allow for payment. Thus, the operating cycle consists of: (a) an inventory cycle, (b) an accounts receivable cycle, and (c) a credit cycle. The operating cycle is (a) plus (b) minus (c). The *Bardahl* formula provides the mechanism for determining each component cycle. See *Central Motor Co. v. United States*, 583 F.2d 470 (10th Cir. 1978); *W. L. Mead, Inc. v. Commissioner*, T.C. Memo. 1975–215 (34 T.C.M. 924, 44 P–H Memo T.C. par. 75,215), affd. 551 F.2d 121 (6th Cir. 1977).

The parties' first point of disagreement concerning application of the *Bardahl* formula relates to petitioner's estimated tax payments during the years in issue. Petitioner contends that these payments should be included in its operating expenses for each year; respondent contends that, since petitioner's operating cycle is very short, quarterly estimated tax payments should not be included. We agree with petitioner.

In *Empire Steel Castings, Inc. v. Commissioner*, T.C. Memo. 1974–34 (33 T.C.M. 155, 165, 43 P–H Memo T.C. par. 74,034), we held that estimated taxes should be included in the *Bardahl* formula calculation. "Since petitioner was required to pay

---

[17]Petitioner has conceded that it was not entitled to deduct Van Tassel's obligation in 1974 as a bad debt. Petitioner's erroneous claim of a bad debt deduction does not preclude petitioner from accumulating its earnings and profits in order to protect its position.

estimated taxes during each of the years in issue, this item is an operating expense which should be appropriately reflected in the equation used to determine the monetary amount needed to fund operations for one business cycle." Under the *Bardahl* formula, *annual* operating expenses are multiplied by the fractional portion of each year in each operating cycle. Since estimated taxes can be computed as an operating expense on an annual basis, this formula properly spreads the estimated taxes throughout the year by apportioning these expenses to each operating cycle. The length of each operating cycle is irrelevant.

The second bone of contention between the parties concerns whether petitioner's accounts receivable cycle should be based on all of petitioner's sales or only petitioner's credit sales. Petitioner argues that since only its credit sales were outstanding receivables, these sales alone should be the basis of the accounts receivable cycle; respondent contends that petitioner distorts the *Bardahl* formula by ignoring the cash portion of its business. We agree with respondent.

The basis of petitioner's argument is that its business is divided conceptually into two portions, a credit side and a cash side. Petitioner then contends that since the "cash side" needs no working capital, the accounts receivable cycle should be based solely on the credit side of its business. The fault in petitioner's argument, however, lies in the fact that the accounts receivable cycle determines the *average* length of time which it takes petitioner to collect for the fuel and other products which it sells. Petitioner's cash sales are a proper part of this average. Moreover, since petitioner's cash sales produce liquid assets to fund petitioner's operations, ignoring these sales in the *Bardahl* calculation would lead to a distorted picture of petitioner's working capital needs.

The third *Bardahl*-related issue in this case concerns petitioner's contention that its peak-month receivables in 1974 were $70,000. Respondent claims the yearend figure, $49,759, is the peak-month figure.[18]

Petitioner's contention is based on its addition of $16,025 for the disallowed Van Tassel bad debt deduction plus an unexplained $4,226 to the yearend figure. We conclude, first, that

---

[18]The parties do not dispute that the peak-month figure should be used. See *Bardahl International Corp. v. Commissioner*, T.C. Memo. 1966–182 (25 T.C.M. 935, 35 P–H Memo T.C. par. 66,182).

petitioner has failed to carry its burden of proving that the additional $4,226 was appropriately added to the yearend accounts receivable. Rule 142(a), Tax Court Rules of Practice and Procedure. Second, we agree with respondent that the Van Tassel obligation should not be added into petitioner's accounts receivable. Working capital needs under the *Bardahl* formula are computed as of each taxable year, as the facts and circumstances then exist. An unforeseeable contingency, such as respondent's disallowance of the claimed bad debt deduction, does not give rise to an adjustment in the computation. *Estate of Lucas v. Commissioner, supra* at 852 n. 10; *Alma Piston Co. v. Commissioner*, T.C. Memo. 1976–107 (35 T.C.M. 464, 483–485, 45 P–H Memo T.C. par. 76,107), affd. 579 F.2d 1000 (6th Cir. 1978).

Finally, petitioner contends for the first time on brief that the *Bardahl* formula should be amended to separate out petitioner's inventory of tires, batteries, and accessories. Petitioner, however, presents no facts in support of this contention other than its assertion that its inventory of tires, batteries, and accessories was smaller at year's end; there are no facts[19] in the record on which we could rely to make an adjustment. Moreover, since the parties' proposed *Bardahl* computations included *total* costs of goods sold and *total* sales (including fuel, tires, batteries, and accessories), we do not believe that a separate computation for certain goods sold by petitioner is necessary. The proposed *Bardahl* computation adequately accounts for petitioner's inventory and sales of items other than fuel.

Therefore, we conclude that the *Bardahl* formula proposed by respondent, with an adjustment for petitioner's estimated tax payments, should be used to determine petitioner's working capital requirements during the years in issue.

3. Dividend Guidelines

In *Estate of Lucas v. Commissioner, supra*, we considered the interaction of the accumulated earnings tax and the dividend guidelines, authorized pursuant to the Economic Stabilization Act of 1970 by the President's Cost of Living Council. We particularly examined the effect of Rev. Proc. 72–11, 1972–1 C.B. 732, on corporations which were not legally subject to the

---

[19]We lack, inter alia, facts pertaining to the month in which petitioner's peak tire inventory occurred, the amount of fuel inventory in that month, petitioner's total sales of tires, batteries, and accessories in a year, and the cost of the tires, batteries, and accessories which petitioner sold.

dividend guidelines. In this Revenue Procedure as issued on January 11, 1972, respondent provided that if a corporate taxpayer not subject to the dividend guidelines[20] permitted its earnings and profits to accumulate in a taxable year ending after June 30, 1971, in order to comply with the "spirit" of the dividend guidelines, to the extent that such accumulations could not be distributed without violating the Cost of Living Council's dividend guidelines such accumulations would not be subject to the accumulated earnings tax provided in section 531. Rev. Proc. 72–11, 1972–1 C.B. 732. In a revision to the Revenue Procedure issued April 3, 1972, respondent added that the corporate taxpayer's subjective intent to comply with the dividend guidelines was not required. Respondent also added that the accumulated earnings tax would not apply *only if* the corporation distributed as dividends the *maximum amount* which was permitted under the guidelines viewed as if the guidelines applied. In *Estate of Lucas* we rejected respondent's attempt in the revised version of Rev. Proc. 72–11 to limit exoneration from the accumulated earnings tax to corporations which paid the maximum allowable dividend. Rather, we concluded that compliance with the dividend guidelines constituted a reasonable need of the taxpayer's business. We also concluded that an inquiry into the taxpayer's subjective intent (to comply with the guidelines) was not necessary.[21] Accordingly, in *Estate of Lucas* we allowed the taxpayer an accumulated earnings credit for the amount of accumulations required or which might be "expected" under the Cost of Living Council's dividend guidelines.

The dividend guidelines applicable to petitioner during the years in issue were as follows:

1972

1. *General Guideline.* Cash dividends on any class of common stock to be paid in 1972 should be declared at such rates that the aggregate annual payment per share (adjusted for stock splits and issuance of stock dividends) will not exceed by more than 4 per cent the highest aggregate annual payment per share in any of the company's fiscal years ending in 1969, 1970, or 1971 (adjusted through December 31, 1971 for stock splits and issuance of stock dividends).

---

[20]As a small, closely held corporation, petitioner was not legally subject to the guidelines but was perhaps "expected" to comply with the "spirit of the guidelines." *Estate of Lucas v. Commissioner*, 71 T.C. 838, 866 (1979).

[21]In this case, we found as a fact that, at least in 1972, petitioner's accountant advised Longway of the dividend guidelines.

2. *Guideline adjustments.* (a) A company that paid no dividend on common stock in the years enumerated in Paragraph 1 or whose permissible dividend payments in 1972, under Paragraph 1, would aggregate less than 25 per cent of net income (after taxes and dividends on preferred stock) in its fiscal year ending in 1971 may declare cash dividends on common stock at such rates that the aggregate dividends paid on common stock in 1972 will not exceed 25 per cent of said 1971 net income.

### 1973

1. *General Guideline.* Cash dividends on any class of common stock to be paid in the calendar year 1973 should be declared at such rates that the aggregate payment per share in that year (adjusted for stock dividends and splits) will not exceed by more than 4 per cent the aggregate payment per share permitted under these Guidelines in the calendar year 1972.

2. *Guideline adjustments.* (a) A company whose permissible dividend payments in 1973, under Paragraph 1, would aggregate less than 25 per cent of net income (after taxes and dividends on preferred stock) in its fiscal year ending in 1972 may declare cash dividends on common stock at such rates that the aggregate dividends paid on common stock in 1973 will not exceed 25 per cent of said 1972 net income.

[Release by the Committee on Interest and Dividends, November 15, 1971, as revised February 15, 1972, and November 29, 1972.]

With respect to petitioner's permissible dividend for 1972 under these guidelines, in 1971 petitioner paid a dividend of $7,300, which was less than 25 percent of its net income of $39,896.52 in 1971. Accordingly, under section 2 of the guidelines for 1972, petitioner could have declared a dividend equal to 25 percent of its 1971 net income,[22] or $9,974.13.

With respect to petitioner's permissible dividend for 1973, in 1972 petitioner again paid a dividend of $7,300, which was less than 25 percent of its net income of $48,806 in 1972. Accordingly, under section 2 of the guidelines, petitioner could have declared a dividend equal to 25 percent of its 1972 net income, or $12,201.50.

In *Estate of Lucas*, we concluded that under Rev. Proc. 72–11 corporations were subject to the accumulated earnings tax only to the extent that corporate distributions were less than the amounts permissible under the dividend guidelines. Rev. Proc. 72–11 was effective for taxable years ending after June 30, 1971, and before January 1, 1974. See Rev. Proc. 73–33, 1973–2 C.B.

---

[22]"Net income" here means taxable income reported on the return less tax paid with the return (including estimated tax payments). *Estate of Lucas v. Commissioner, supra* at 866.

489; Rev. Proc. 72–11, *supra*. Accordingly, applying *Estate of Lucas* to this case, we conclude that petitioner is subject to the accumulated earnings tax in 1972 and 1973 only to the extent that its actual dividends ($7,300 in both years) were less than the maximum permissible dividends under the dividend guidelines ($9,974.13 in 1972, $12,201.50 in 1973). To the extent that petitioner's accumulations exceeded the maximum permissible dividends in those years, petitioner is entitled to an accumulated earnings credit under section 535.[23]

## B. *Purpose*

The next issue is whether petitioner was availed of for the purpose of avoiding income tax with respect to its shareholder (Longway) during the years in issue. Section 533(a) provides:

For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

In this case, we have concluded that in each of the years in issue petitioner's earnings and profits were accumulated beyond its reasonable needs. Nevertheless, petitioner contends that it has carried its burden of proving that it was not availed of for the proscribed purpose. We disagree.

Whether a corporation was availed of for the purpose of avoiding income taxes with respect to its shareholder is a question of fact. *Bremerton Sun Publishing Co. v. Commissioner*, 44 T.C. 566, 582 (1965). The corporation must prove that tax avoidance with respect to its shareholders was not one of the purposes for its accumulation of earnings and profits beyond its reasonable needs. *United States v. Donruss Co.*, 393 U.S. 297 (1969). Corporate purpose or intent is a subjective question, difficult of proof. However, section 1.533–1(a)(2), Income Tax

---

[23]We held in *Estate of Lucas* that "the reasonable need to accumulate to meet the guidelines is a need only to the extent it exceeds other reasonable needs, so that [other reasonable business needs] which respondent allowed as a section 535(c) credit [are] subsumed within, and [are] not in addition to the amount of the credit we have determined here." *Estate of Lucas v. Commissioner, supra* at 867 n. 15. That conclusion applies equally in this case, so that petitioner's other reasonable business needs (such as $75,000 for its truck service-repair facility in each year, $9,717 in 1972 and $8,203 in 1973 for new equipment, and petitioner's working capital needs as determined under the *Bardahl* formula) are subsumed within the credit allowed for compliance with the dividend guidelines.

Regs., provides three indicia of the purpose to avoid income tax with respect to a corporation's shareholders:

(i) Dealings between the corporation and its shareholders, such as withdrawals by the shareholders as personal loans or the expenditure of funds by the corporation for the personal benefit of the shareholders,

(ii) The investment by the corporation of undistributed earnings in assets having no reasonable connection with the business of the corporation (see sec. 1.537–3), and

(iii) The extent to which the corporation has distributed its earnings and profits.

In this case, all three indicia of the proscribed purpose are present. First, petitioner loaned funds ranging from $70,000 to $100,000 to its sole shareholder, Longway. Longway invested these funds in certificates of deposits, paid 4½- or 5-percent interest to petitioner, and kept the remainder of the interest received for his own benefit. Second, petitioner invested in assets unrelated to its business. Petitioner maintained an "investment management account" at a local bank. Through this account petitioner owned blocks of common stock in at least a dozen corporations, none of which was related to petitioner's trade or business. Third, petitioner had a poor dividend history. Petitioner's dividends were not based on the earnings and profits of the corporation but, rather, were a percentage of Longway's original contribution to petitioner. Moreover, the dividends amounted to only 14 percent of petitioner's net income after taxes in 1972, 16 percent in 1973, and 7 percent in 1974. In addition, after petitioner began paying dividends to Longway in 1971, it decreased his compensation in 1972 so that the total amount Longway received from petitioner (dividends plus compensation) remained virtually unchanged from 1971 through 1974. Petitioner saved taxes for Longway by not paying dividends to him during the years in issue.

Petitioner, however, contends that Longway did not intend to use the corporation for the purpose of avoiding his proper income taxes. Petitioner contends, first, that Longway was a conservative businessman accustomed to retaining earnings in a business. Second, petitioner contends that Longway lacked the requisite intent since he merely followed the advice he received from his accountant. Finally, petitioner contends that the objective factors which respondent points to do not establish that Longway had tainted motives.

We reject petitioner's contentions. We cannot accept petitioner's assertion that Longway did not know the tax consequences of his actions and merely relied on his accountant. Longway was a very skillful businessman who managed to increase his sales and profits during an extremely difficult period for his industry. We do not believe that he did not know the tax consequences of retaining petitioner's earnings and profits in the corporation, and we reject as incredible testimony to the contrary. On this basis, we conclude that petitioner has not carried its burden of disproving the presumption which arises from our finding that its earnings and profits accumulated beyond its reasonable needs. The objective factors set forth in respondent's regulations all buttress this presumption, and petitioner has presented no credible evidence that it was not availed of to avoid income tax with respect to its shareholder. See *Oklahoma Press Publishing Co. v. United States*, 437 F.2d 1275 (10th Cir. 1971). Accordingly, petitioner is liable for the tax imposed under section 531.

*Decision will be entered under Rule 155.*